STATE OF NORTH CAROLINA v. JOHN LITTLETON THOMPSON

No. COA02-1220

(Filed 20 May 2003)

### 1. Threats— misdemeanor stalking—motion to dismiss—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss the charge of misdemeanor stalking under N.C.G.S. § 14-277.3, because there was sufficient evidence from which the jury could find that defendant followed or was in the presence of the victim on more than one occasion without legal purpose and with the intent to cause her emotional distress by placing her in fear of death or bodily injury.

### 2. Threats— communicating threats—motion to dismiss—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss the charge of communicating threats under N.C.G.S. § 14-277.1, because: (1) N.C.G.S. § 14-277.1 prohibits both direct and indirect threats communicated to the victim; and (2) the fact that defendant utilized a third person to communicate his threats as part of his "psychological warfare" against the victim does not negate the criminality of defendant's behavior.

Appeal by defendant from judgment entered 8 May 2002 by Judge W. Allen Cobb, Jr. in Carteret County Superior Court. Heard in the Court of Appeals 16 April 2003.

*Attorney General Roy Cooper, by Special Deputy Attorney General Lars F. Nance, for the State.*

*Thomas R. Sallenger for defendant appellant.*

TIMMONS-GOODSON, Judge.

John Littleton Thompson ("defendant") appeals from his conviction and resulting sentence entered upon jury verdicts finding him guilty of misdemeanor stalking and communicating threats. For the reasons stated herein, we uphold defendant's conviction.

The evidence before the trial court tended to show the following: Adolph Bomba ("Bomba") testified for the State. Bomba stated that he was a resident of Emerald Isle, North Carolina, and was

acquainted with defendant as well as the alleged victim, Saundra Wood ("Wood"). At the time of the alleged events, Wood worked with Ashley Denton ("Denton") at the Bogue Inlet Pier ("the pier"), which was owned and operated by Mike Stanley ("Stanley").

Bomba explained that he had known defendant on a casual basis for several years and often encountered him while walking on the beach. During one of their encounters, defendant informed Bomba that he had been born at Camp Lejeune, North Carolina, and that "the government had planted a microchip in him to keep track of him when he was a baby." Bomba testified that he avoided further conversations with defendant after this disclosure. On 18 November 2001, defendant approached Bomba on the beach, stating, "I have to talk to you today." Defendant then informed Bomba that

Emerald Isle police were harassing him and that actually Ashley [Denton] had turned him in for stalking and he had to go to court for that and he felt the officials were harassing him and that's why, and Mike Stanley had told him that he couldn't come to the pier anymore because he used to park at the pier and walk. So he wasn't allowed up there, and that he was going to get all of these people and that he had something wrong up here. He tapped his head and he was going to get disability and when he got disability he was going to go out and buy two guns, and he was going to blow away some Emerald Isle police that had been harassing him, Mike Stanley, Saundra [Wood] and Ashley [Denton] and burn the pier down.

When Bomba warned defendant that he could "get in serious trouble . . . making threats," defendant responded that, "There's nothing anybody can do to me. The judge can't do anything, the police can't do anything, and I'm going to do it." Defendant then repeated his threat to purchase weapons and shoot various persons. Following his conversation with defendant, Bomba walked to the pier and related defendant's threats to Stanley, Wood, and Denton. Bomba testified that he did not want to "be involved" but felt that, "considering the events that have been happening in the last year, [he would not be] doing the proper thing by not telling them."

Saundra Wood gave further evidence for the State. Wood testified that she had been acquainted with defendant for several years, because he often visited the pier where she worked. Wood often observed defendant at the pier's parking lot, where "he would stretch

STATE v. THOMPSON

[157 N.C. App. 638 (2003)]

like he was running or walking, exercising on the beach." According to Wood, defendant frequented the pier more often in April of 2001, after Stanley hired nineteen-year-old Denton, in whom defendant developed a romantic interest. Wood stated that, once Denton began working, she observed defendant at the pier "at least five times a week." Wood confirmed, however, that her relationship with defendant remained limited to a casual acquaintance, and that she did not even know his last name.

During the summer of 2001, Wood's relationship with defendant changed when he appeared unexpectedly at her residence. Defendant departed after Wood informed him that she was not interested in smoking marijuana with him. Wood testified that she resided "on a dead-end [dirt] road" in Onslow County, and that she had never informed defendant of her address. According to Wood, there was "nothing on [her] road," and she knew that defendant resided in another county approximately thirty miles from her home.

In August of 2001, Wood had a further unpleasant encounter with defendant at the pier during which he "threw a pack of cigarettes at [her] and [she] picked them up and threw them back at him and told him that [Denton] didn't want anything to do with him." Defendant responded by "storm[ing] out of the pier and he yelled back and he said, 'Women are not allowed to talk to men in that tone of voice and you will be sorry.' " The following morning, defendant telephoned Wood and told her again that she "had better never speak to him like that again; that women could not talk to men like that and [she] would live to regret it."

Following this incident, Wood contacted law enforcement about defendant's behavior. Stanley, Wood's employer, also informed defendant that he was no longer welcome on the pier property. Shortly thereafter, Wood observed defendant "going up and down [the] road [leading to her residence]" at least five or six times. When she inquired among her neighbors about his presence, they informed Wood that, although they did not know him, defendant "was telling people 'Don't let me catch you going to [or leaving] her house.' " Because of defendant's behavior, law enforcement officers informed Wood that "it probably wouldn't be safe for [her] to stay home by [herself]." Frightened, Wood left her residence and lived at a friend's house for two weeks. She also purchased a firearm for personal protection. Wood testified that, although she disliked guns, she felt the purchase was necessary

Because I had no idea what [defendant] was going to do. He kept threatening to shoot me and burn my house down, the pier down, shoot other people, and I had no idea what he would do after all of this stuff had happened, you know, to other people in other parts of the country. You know, you don't know.

On 20 November 2001, Wood summoned law enforcement when she observed defendant standing on the steps of the pier where she worked, in apparent violation of a restraining order. According to Wood, the restraining order mandated that defendant remain at a distance of at least five hundred feet from Wood. Responding law enforcement officers took defendant into custody when they arrived.

Emerald Isle police officer Chris Cox ("Officer Cox") testified for the State and stated that he took defendant into custody on 20 November 2001. While in custody, defendant informed Officer Cox that he had "not tried to hurt anyone, but I am using psychological warfare against the people that are trying to hurt me." Defendant confirmed that Wood was "one of the people trying to hurt him." During cross-examination, Cox confirmed that the restraining order against defendant was signed on 6 September 2001 and restricted defendant's proximity to the pier to a distance of one hundred feet. Cox stated that, when he arrested him, defendant was approximately seventy-five feet away from the pier.

Defendant testified on his own behalf. Defendant characterized his statements to Bomba concerning a government-implanted microchip as "a joke." Defendant further denied that he threatened Wood or anyone else, but rather had told Bomba

that they [Wood, Denton and Stanley] were being mean to me, and that if I wanted to be mean to them I could go down there and shoot the whole bunch and burn the bleeding pier down, except I used a different word, and then the next sentence, I said but I couldn't do that because God had a'hold [sic] of me, and I, you know, I couldn't do that.

Defendant further explained that he was self-employed as a handyman, and that Wood had asked him to visit her house in order to give her an estimate for repairing her roof. Defendant denied driving on the road leading to Wood's residence at any other time. According to defendant, Wood was jealous because of his romantic interest in Denton, and that she had once "mentioned something to me about

coming over to her house when her boyfriend was gone or something, but I wasn't interested in her." Defendant denied stalking or threatening Wood.

Upon considering the evidence, the jury found defendant guilty of stalking and communicating threats, for which the trial court imposed a suspended sentence of forty-five days' imprisonment and placed defendant on supervised probation. From his conviction and resulting sentence, defendant appeals.

[1] On appeal, defendant argues that the trial court erred in (1) denying his motion to dismiss the charge of misdemeanor stalking; and (2) denying his motion to dismiss the misdemeanor charge of communicating threats. Defendant asserts that there was insufficient evidence to convict him of these charges. For the reasons stated herein, we conclude that there was sufficient evidence from which the jury could find defendant guilty of stalking and communicating threats, and we therefore find no error in the judgment of the trial court.

Upon a motion to dismiss in a criminal action, the trial court must view all of the evidence in the light most favorable to the State. *See State v. Pierce*, 346 N.C. 471, 491, 488 S.E.2d 576, 588 (1997). Contradictions or discrepancies in the evidence must be resolved by the jury, and the State should be given the benefit of any reasonable inference. *See State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). The trial court must then decide whether there is substantial evidence of each element of the offense charged. *See State v. Smith*, 300 N.C. 71, 78, 265 S.E.2d 164, 169 (1980). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 78-79, 265 S.E.2d at 169.

At the time of the alleged events, the offense of stalking occurred

if the person willfully on more than one occasion follows or is in the presence of another person without legal purpose and with the intent to cause death or bodily injury or with the intent to cause emotional distress by placing that person in reasonable fear of death or bodily injury.

N.C. Gen. Stat. § 14-277.3(a) (1999).[1] Defendant argues that the State failed to present sufficient evidence that (1) he willfully on more than one occasion followed or was in the victim's presence without legal

1. Section 14-277.3 has since been amended with an effective date of 1 March 2002. It presently defines the offense of stalking as occurring

STATE v. THOMPSON

[157 N.C. App. 638 (2003)]

purpose and (2) that he had the necessary intent to cause Wood emotional distress. We disagree.

The State presented evidence tending to show that, in August of 2001, defendant and Wood were involved in an altercation during which defendant informed Wood that "women are not allowed to talk to men in that tone of voice and you will be sorry." Defendant telephoned Wood the following morning and warned her that she "had better never speak to him like that again" and she "would live to regret it." Stanley then informed defendant that he was no longer allowed on pier property, and Wood contacted law enforcement concerning defendant. After these express warnings that his presence was not welcome, defendant thereafter drove up and down the isolated, dead-end dirt road leading to Wood's residence and told her neighbors that he had better not "catch [them] going to [or leaving] [Wood's] house." There were no businesses or other establishments on the road, and none of Wood's neighbors was acquainted with defendant. On 20 November 2001, defendant appeared on the steps of the pier where Wood worked despite a restraining order ordering him to remain either five hundred or one hundred feet away from the pier or Wood. Defendant told Cox that he was engaged in "psychological warfare" against Wood and told Bomba that he intended to "buy two guns, and . . . blow away some Emerald Isle police that had been harassing him, Mike Stanley, Saundra [Wood] and Ashley [Denton] and burn the pier down."

We conclude that there was sufficient evidence from which the jury could find that defendant followed or was in the presence of

---

if the person willfully on more than one occasion follows or is in the presence of, or otherwise harasses, another person without legal purpose and with the intent to do any of the following:

(1) Place that person in reasonable fear either for the person's safety or the safety of the person's immediate family or close personal associates.

(2) Cause that person to suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment, and that in fact causes that person substantial emotional distress.

N.C. Gen. Stat. § 14-277.3(a) (2001). The statute further defines the term "harasses" or "harassment" as

knowing conduct, including written or printed communication or transmission, telephone or cellular or other wireless telephonic communication, facsimile transmission, pager messages or transmissions, answering machine or voice mail messages or transmissions, and electronic mail messages or other computerized or electronic transmissions, directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose.

N.C. Gen. Stat. § 14-277.3(c) (2001).

Wood on more than one occasion without legal purpose and with the intent to cause her emotional distress by placing her in fear of death or bodily injury. We therefore overrule defendant's first assignment of error.

**[2]** Defendant further assigns error to the trial court's denial of his motion to dismiss the charge of communicating threats. A person is guilty of communicating threats if without lawful authority:

> (1) He willfully threatens to physically injure the person or that person's child, sibling, spouse, or dependent or willfully threatens to damage the property of another;

> (2) The threat is communicated to the other person, orally, in writing, or by any other means;

> (3) The threat is made in a manner and under circumstances which would cause a reasonable person to believe that the threat is likely to be carried out; and

> (4) The person threatened believes that the threat will be carried out.

N.C. Gen. Stat. § 14-277.1(a) (2001). Defendant asserts that there was insufficient evidence of this offense in that there was no evidence that he directly communicated his threats to Wood. Rather, the evidence tended to show that after being banned from the pier by Stanley and the restraining order, defendant told Bomba that "he was going to go out and buy two guns, and he was going to blow away some Emerald Isle police that had been harassing him, Mike Stanley, Saundra [Wood] and Ashley [Denton] and burn the pier down." When warned that he could "get into serious trouble [by] making threats," defendant responded that, "There's nothing anybody can do to me. The judge can't do anything, the police can't do anything, and I'm going to do it." Concerned, Bomba walked directly to the pier and relayed defendant's threats to Wood, Stanley and Denton. Defendant argues that, as he did not make these statements directly to Wood, he cannot be found guilty of communicating threats. We disagree.

Statutes should be construed to ensure that the purpose of the legislature is accomplished. *See Woodson v. Rowland*, 329 N.C. 330, 338, 407 S.E.2d 222, 227 (1991); *State v. Hines*, 122 N.C. App. 545, 550, 471 S.E.2d 109, 112 (1996), *disc. review improvidently allowed*, 345 N.C. 627, 481 S.E.2d 85 (1997). Additionally, in construing a statute, undefined words should be given their plain meaning if it is reason-

able to do so. *See Woodson*, 329 N.C. at 338, 407 S.E.2d at 227. We first note that, on its face, section 14-277.1 contains no language requiring that a threat be directly communicated to a victim by the perpetrator. Defendant nevertheless urges this Court to adopt such a requirement by interpreting the words of section 14-277.1(a)(2)—"the threat is communicated"—to encompass only direct communication between the perpetrator and the victim. Defendant cites no authority supporting his interpretation of the statute, nor have we discovered any North Carolina cases dealing directly with this issue. We therefore examine the language of the statute and the apparent intent of the General Assembly in consideration of defendant's argument.

The offense of communicating threats is codified in Article 35, entitled "Offenses Against the Public Peace," of Chapter 14 of the General Statutes. As an offense against the public peace, the gravamen of communicating threats is the making and communicating of a threat, and thus there is no requirement in section 14-277.1 that the threat actually be carried out. *See State v. Roberson*, 37 N.C. App. 714, 715, 247 S.E.2d 8, 9 (1978). Even conditional threats, if made and communicated by a defendant in a manner and under circumstances which would cause a reasonable person to believe that the threat was likely to be carried out, can constitute a violation of section 14-277.1, if the victim in fact believed the threat would be carried out. *See id.* at 715-16, 247 S.E.2d at 9-10. The word "communicate" is not defined under the statute. The ordinary meaning of the word "communicate" is "to make known; impart." *The American Heritage Dictionary* 299 (2nd ed. 1982). In apparent recognition of the numerous methods of communication that might be employed to relate a threat, section 14-277.1 allows a threat to be communicated "orally, in writing, or *by any other means*." N.C. Gen. Stat. § 14-277.1(a)(2) (emphasis added). This broad language, permitting a threat to be communicated by any means, strongly rebuts defendant's position that the legislature intended only direct threats to be punishable as an offense against the public peace.[2]

Defendant's argument concerning the viability of an indirect threat more reasonably relates to the statute's other essential elements, namely, the requirements that the threat be made in a manner

---

2. It is also notable, if not conclusive, that the legislature drafted 14-277.1(a)(2) utilizing the passive rather than the active voice. The use of the passive language for this element—"the threat is communicated"—rather than active language, such as "defendant communicates the threat," further weakens defendant's position that an offender must communicate directly with a victim in order to violate the statute.

and under circumstances which would cause a reasonable person to believe that the threat is likely to be carried out, and that the person threatened believes that the threat will be carried out. Indeed, it is precisely such fear on the part of a victim that offends the public peace and that the statute is designed to prevent. *See Roberson,* 37 N.C. App. at 715, 247 S.E.2d at 9 (noting that there is no requirement that a threat be carried out, merely that the person threatened believes that the threat will be carried out). Other jurisdictions construing similar statutes have concluded that indirect threats are functionally indistinguishable from direct threats, and that "[t]he rationale for imposing criminal liability for such indirect threats is especially strong where . . . the defendant is prohibited from contacting the victim and therefore may resort to other means of communicating the threat." *State v. Warsop,* 124 N.M. 683, 687, 954 P.2d 748, 752 (1997) (affirming conviction of retaliation against a witness where, upon being granted parole, the defendant told a correctional officer he intended to kill a witness who testified against him), *cert. denied,* 124 N.M. 589, 953 P.2d 1087 (1998); *State v. Lance,* 222 Mont. 92, 108, 721 P.2d 1258, 1269 (1986) (affirming the defendant's conviction of intimidation based on indirect threats and reasoning that, if only direct threats were punishable, "an individual could contact the news media threatening to take the life of a hostage if the Governor does not meet his demands, and he could not be convicted under this statute. But it is this very situation which the statute is aimed at outlawing."). We conclude that section 14-277.1 prohibits both direct and indirect threats communicated to the victim.

In the present case, defendant was prohibited by the restraining order from contacting Wood directly at the time he made his threat against her. Defendant threatened to purchase weapons, "blow away" Wood, and burn down the pier where she worked. Wood took these threats seriously, abandoning her home and purchasing a firearm for her protection. Defendant admitted that he was engaged in "psychological warfare" against Wood. The fact that defendant utilized a third person to communicate his threats as part of that "psychological warfare" does not negate the criminality of defendant's behavior. We conclude that there was sufficient evidence from which the jury could find defendant guilty of communicating threats. We therefore overrule this assignment of error.

In conclusion, we hold that the trial court did not err in denying defendant's motion to dismiss the charges against him. In the judgment of the trial court, we find

No error.

Judges BRYANT and GEER concur.