IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-624

Filed 3 June 2026

Wake County, Nos. 21CR212923-910, 21CR212924-910, 21CR212925-910, 21CR212926-910, 21CR212927-910

STATE OF NORTH CAROLINA

v.

JESSE NATHAN METCALF

Appeal by Defendant from judgments entered on 10 October 2024 by Judge Vinston M. Rozier, Jr. in Wake County Superior Court. Heard in the Court of Appeals 21 April 2026.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Ameshia Cooper Chester, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt Orsbon, for the defendant.*

WOOD, Judge.

Jesse Metcalf ("Defendant") appeals from judgments entered following jury verdicts finding him guilty of thirteen counts of violating a domestic violence protective order and one count of felony stalking. On appeal, Defendant contends the trial court erred by: (1) denying Defendant's motion to dismiss the stalking charge for insufficient evidence and (2) violating Defendant's right to be present at all stages of trial and a public trial by meeting with jurors alone prior to sentencing. After careful review of the record, we conclude Defendant received a fair trial free from error.

## I. Factual and Procedural Background

Defendant and Amy Metcalf ("Amy") were married on 12 May 2013. They share a son born in 2017 and a daughter born in 2018.

On Christmas Day 2019 there was significant marital tension between Defendant and Amy. Amy was driving the family home from Christmas celebrations at her grandparents' house when Defendant kept trying to push the start button and turn off the car in such a manner that Amy feared it might cause an accident. After getting home, Amy decided to take the children to her mother's house to give Defendant time to "cool down." She loaded the kids into the car and called her mother to give her notice. Her mother suggested she bring some things for the children. While still on the phone with her mother, Amy returned to their marital home. In the house, Defendant confronted Amy telling her she wasn't going to "take his kids away" and threatened to kill her if she tried to leave. Defendant then pulled out a handgun and shot it at Amy's head, narrowly missing her. Amy's mother, who was still on the phone, called the police. Defendant was arrested and charged with several criminal offenses due to his actions. Two days later Amy sought and was granted a Domestic Violence Protection Order ("DVPO").

In February 2020, Amy and Defendant reconciled. In August 2020, Amy sought to have the DVPO dismissed. However, in October 2020 Amy retained a divorce attorney; and, in December 2020, she moved out of the marital home.

In January 2021, the couple began divorce proceedings. However, as mediation approached in May of 2021, Defendant began sending Amy a series of threatening messages telling her she needed to drop the charges against him from 2019 or he would kill her. The messages included such threats as, ". . . I am fixing to murder your whole f…ing family" and

> If it doesn't get dropped in the next month, your family will be dead by Christmas . . . I will slaughter every f…ing one of you. I am not joking bitch. I will slit the throat of both your sisters, your mother and your father. Don't worry, though, this muzzleloader revolver will drop them before I slit them. Keep thinking you are a funny bitch.

Based on these ongoing threats, Amy sought and was granted an emergency DVPO in May 2021. A permanent order was entered on 7 July 2021, effective until 7 July 2022, prohibiting Defendant from contacting Amy by any means, including contact by telephone.

After the DVPO was entered, Defendant was arrested on unrelated charges. On 16 August 2021, Amy received seven phone calls from the Wake County Detention Center. The calls caused her to worry and fear that she was "going through this all over again." She dreaded the calls because she did not know if he was going to tell her to drop the charges, tell her he was "going to come and kill [her]," or even notify her that he was getting out of jail. The phone calls began at 3:44 P.M. and continued intermittently until 5:13 P.M. when the couple's then four-and-a-half-year-old son answered the seventh call. Once Amy realized her son had picked up the call, she

placed it on speaker phone so the children could speak to Defendant, but she did not speak or respond to Defendant's repeated attempts to engage her. During the call Defendant repeatedly asked to speak with Amy and told their son to "ask mommy" to "drop the DVPO so we can talk together" and to "cancel the divorce."

The following day, 17 August 2021, Defendant placed six more calls to Amy, but she did not answer. The calls made her angry and fearful, so she reported them to law enforcement. On 18 August, Defendant's telephone privileges were revoked.

As a result of the phone calls, Defendant was charged with thirteen counts of misdemeanor domestic violence protective order violation and one count of felony stalking. The charges came on for trial in Wake County Superior Court on 8 October 2024.

The jury heard testimony from Amy; Giovanni Calravuturo, the individual in charge of the phone system at Wake County Detention Center; Sergeant Wallace O'Neal of the Wake County Sheriff's Office; and Mia Brown, a deputy clerk in the Wake County Clerk of Court's Office. At the close of the State's evidence defense counsel moved to dismiss all the charges due to insufficient evidence. The trial court denied the motion. Defendant did not present any witnesses but renewed the motion to dismiss at the close of all evidence. The trial court again denied the motion. The jury found Defendant guilty on all fourteen charges.

Following entry of the jury's verdicts, the trial judge discharged the jury but invited the jury to stay for sentencing. The prosecutor asked the trial court for some

time before proceeding to sentencing to allow certain parties to be present who wanted to address the trial court prior to sentencing. The trial court allowed a sixteen-minute recess and met with jurors in the jury room during the recess.

After the recess Amy addressed the trial court about her wishes for sentencing stating she was "absolutely 100 percent convinced that when [Defendant] gets out, he's going to try to kill [her] or will kill [her]." In addition, the prosecutor originally assigned to Defendant's case spoke about how "deadly . . . serious" Defendant was about his threats. She stated Defendant was "proficient with firearms" and they "took over 60 weapons from his home." She asked the trial court to "utilize the sentencing grid to protect [Amy] for as long as reasonably possible" because he has continued to make plans to "end [Amy's] life" and the lives of others who have helped her.

Ultimately, Defendant was sentenced to 10 to 21 months of imprisonment for felony stalking, followed by two consecutive 75-day sentences for domestic violence protective order violations. The trial court ordered this sentence to run at the expiration of the sentence Defendant was currently serving. This was the maximum sentence the trial court could give. Defendant gave notice of appeal in open court.

## II. Analysis

Defendant raises two issues on appeal. Defendant contends the trial court erred by: (1) denying Defendant's motion to dismiss the stalking charge for insufficient evidence; and (2) violating Defendant's right to presence and a public trial by meeting with jurors alone prior to sentencing.

## A. Motion to Dismiss

Defendant contends the State failed to present sufficient evidence that Defendant committed "two or more" of the proscribed actions required for stalking. We disagree.

> The proper standard of review on a motion to dismiss based on insufficiency of the evidence is the substantial evidence test. The substantial evidence test requires a determination that there is substantial evidence (1) of each essential element of the offense charged, and (2) that defendant is the perpetrator of the offense. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. If there is substantial evidence of each element of the charged offense, the motion should be denied.

*State v. Boykin*, 275 N.C. App. 187, 190, 853 S.E.2d 781, 784 (2020) (quoting *State v. Key*, 182 N.C. App. 624, 628-29, 643 S.E.2d 444, 448 (2007)). Additionally, "[i]n ruling upon a motion to dismiss, the trial court is required to view the evidence in the light most favorable to the State, making all reasonable inferences from the evidence in favor of the State." *State v. Smith*, 294 N.C. App. 724, 726, 904 S.E.2d 434, 436 (2024) (quoting *State v. Kemmerlin*, 356 N.C. 446, 473, 573 S.E.2d 870, 889 (2002)).

Defendant was indicted for felony stalking in violation of a court order under N.C. Gen. Stat. § 14-277.3A. The general offense of stalking reads,

> A defendant is guilty of stalking if the defendant willfully on more than one occasion harasses another person without legal purpose or willfully engages in a course of conduct directed at a specific person without legal purpose and the defendant knows or should know that the harassment or the course of conduct would cause a

reasonable person to do any of the following:

(1) Fear for the person's safety or the safety of the person's immediate family or close personal associates.

(2) Suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment.

N.C. Gen. Stat. § 14-277.3A (c).

A person "who commits the offense of stalking when there is a court order in effect prohibiting the conduct described under this section by the defendant against the victim is guilty of a Class H felony." N.C. Gen. Stat. § 14-277.3A (d). Therefore, the necessary elements of the offense of felony stalking in violation of a court order are that the defendant: (1) acted willfully; (2) harassed another person or engaged in a course of conduct; (3) without legal purpose on more than one occasion; (4) knew or should have known that the course of conduct would cause a reasonable person to fear for his or her safety or "suffer substantial emotional distress by placing that person in fear of, death, bodily injury, or continued harassment"; and (5) there was an active court order in effect prohibiting the behavior. *Id.* § 14-277.3A(c), (d); *See also State v. Smith,* 294 N.C. App. 724, 728, 904 S.E.2d 434, 437 (2024).

It is uncontested that Defendant acted willfully, without legal purpose, knew or should have known it would cause substantial emotional distress, and there was a court order in effect. However, Defendant argues the State failed to provide substantial evidence that his behavior qualified as a "course of conduct" as alleged in

the indictment and argues the State failed to prove that he engaged on more than one occasion because only one of the calls was answered. We disagree.

In the indictment charging Defendant with felony stalking, the State relied on a theory of "course of conduct" stating that Defendant "engaged in a course of conduct" causing severe emotional distress by "placing that person in fear of continued harassment." Additionally, "where the indictment for a crime alleges a theory of the crime, the State is held to proof of that theory and the jury is only allowed to convict on that theory." *State v. Little*, 296 N.C. App. 424, 430, 909 S.E.2d 363, 368 (2024) (quoting *State v. Taylor*, 304 N.C. 249, 275, 283 S.E.2d 761, 778 (1981) *cert. denied*, 463 U.S. 1213, 103 S.Ct. 3552, 77 L.Ed.2d 1398 (1983)). Therefore, the State must have provided sufficient evidence of Defendant's "course of conduct."

The statute defines course of conduct as:

> Two or more acts, including, *but not limited to*, acts in which the stalker directly, indirectly, or through third parties, by *any action, method, device, or means*, is in the presence of, or follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

N.C. Gen. Stat. § 14-277.3A(b)(1)(emphasis added). The Legislature specifically stated that the list of acts in the statute is not exhaustive. This is consistent with the Legislature's explicit intent to "enact a stalking statute that permits the criminal justice system to hold stalkers accountable for a wide range of acts, communications, and conduct." N.C. Gen. Stat. § 14-277.3A (a).

In the case *sub judice,* the State admitted at trial the DVPO issued on 7 July 2021 in effect at the time of the conduct. The DVPO contains conclusions that on 28 May 2021 Defendant placed Amy in fear of imminent serious bodily injury and continued harassment that rose to the level of inflicting substantial emotional distress via text messages. The conclusions were based on the findings that Defendant had previously used deadly force by shooting at Amy and had threatened to use deadly force again to seriously injury or kill her. The DVPO dictated that Defendant "shall have no contact" with Amy including by telephone, email, pager or fax machine.

The State presented testimony from Wake County Detention Center staff concerning the thirteen phone calls Defendant made to Amy between 16 and 17 August 2021. Additionally, a recording of the call answered by their four-and-a-half-year-old son was admitted into evidence and played for the jury. During the call Defendant requested the child ask his mommy to "drop the DVPO so we can talk together" and to "cancel the divorce."

Amy testified to the "incredible amount of dread and fear" she felt receiving Defendant's repeated phone calls. She stated she was "worried, scared and [had the] deepest sense of dread that you have in the bottom of your stomach" that he would threaten her, push her to drop charges, get out of jail, or come and kill her.

Defendant acknowledges that the one phone call answered by the child was a single act that "communicates to or about a person" consistent with the stalking

statute but argues that because the other calls were not answered, he was not "communicating" and, therefore, the State did not have evidence of two acts, which is necessary to form a "course of conduct." In his argument to this Court Defendant even provided the ordinary definition of "communicate" as "to make known; impart." *State v. Thompson*, 157 N.C. App. 638, 645, 580 S.E.2d 9, 14 (2003) (quoting *The American Heritage Dictionary* 299 (2d ed. 1982)). However, Defendant fails to consider that communication does not require verbal words. By repeatedly calling Amy in violation of the DVPO Defendant clearly "ma[d]e known" and "imparted" the fact that he was not going to leave her alone and would not be stopped by the DVPO. This message was clearly received by Amy, who testified that she was very scared he would continue to harass her and would hurt her when he was released.

The State presented sufficient evidence that Defendant's actions, repeatedly utilizing the phone to communicate to Amy that he would not be stopped by the DVPO, met the statutory requirement of two acts necessary to form a "course of conduct." Additionally, our finding that Defendant's repeated phone calls in violation of a DVPO can form a "course of conduct" is consistent with the General Assembly's recognition of "the dangerous nature of stalking as well as the strong connections between stalking and domestic violence" and their desire to "enact[] [a] law to encourage effective intervention by the criminal justice system before stalking escalates into behavior that has serious or lethal consequences." N.C. Gen. Stat. § 14-277.3A(a). Therefore, the trial court did not err in denying Defendant's motion to

dismiss the charge of felony stalking.

**B. Meeting with Jurors**

Defendant next contends the trial court erred by meeting with jurors alone prior to sentencing thereby violating Defendant's right to be present at every stage of trial and a public trial. We disagree.

In North Carolina, sentencing for criminal cases requires the active participation of the jury in capital murder trials or when aggravating or mitigating factors must be determined. N.C. Gen. Stat. § 15A-1340.16; N.C. Gen. Stat. 15A-2000. This case was neither a capital murder trial nor one requiring the jury to determine aggravating or mitigating factors. Once the jury returned its verdicts, the trial court was free to discharge the jurors. Moreover, sentencing hearings may be conducted separately from the trial and can occur well after the jury is discharged.

Here, the trial court discharged the jury and then "invite[d] [the jurors] to stay" after sentencing to allow the trial court to thank them for their service and receive any feedback they might provide on improving the court experience. This is a routine practice in courtrooms across the state. However, when the district attorney requested a short recess to ensure the necessary parties were able to be present to address the trial court prior to sentencing, the trial court stated it would meet with the jurors during the recess. The trial court further stated that "if they want to hang around" for sentencing that would "be fine." The jury had clearly been discharged, as their duties were complete; therefore, Defendant's presence was not required

during the trial court's subsequent conversation with the jurors. Further, Defendant's counsel did not object to this routine meeting with jurors after the trial concluded; therefore, this issue was not preserved for appellate review because "constitutional issues not raised and passed upon at trial will not be reviewed for the first time on appeal." *State v. Garcia*, 358 N.C. 382, 415, 597 S.E.2d 724, 748 (2004) (quoting *State v. Watts*, 357 N.C. 366, 372, 584 S.E.2d 740, 745 (2003)).

Alternatively, Defendant requests we utilize N.C. R. App. P. 2 to review this issue "to prevent manifest injustice." We decline to do so. "An appellate court's decision to invoke Rule 2 and suspend the appellate rules is always an exercise of discretion." *State v. Barnes*, 278 N.C. App. 245, 248, 862 S.E.2d 852, 854 (2021). Additionally, our Supreme Court has instructed that "the exercise of Rule 2 was intended to be limited to occasions in which a fundamental purpose of the appellate rules is at stake, which will necessarily be rare occasions." *State v. Hart*, 361 N.C. 309, 316, 644 S.E.2d 201, 205 (2007) (cleaned up). Although Defendant contends a constitutional right is at issue — and that such a right constitutes a substantial right — a thorough review of the record demonstrates that no such constitutional issue exists. At the time the trial court met with the jurors, Defendant's trial had concluded and the jury had been discharged. Therefore, in our discretion we decline to invoke rule 2 to address the merits of Defendant's argument.

### III.  Conclusion

The trial court properly denied Defendant's motion to dismiss the charge of

felony stalking when the State presented sufficient evidence of a "course of conduct" that included at least two instances of communication.  Additionally, the trial court did not err by meeting with jurors after the trial had been completed and the jury had been discharged.  Defendant received a fair trial free from error.

NO ERROR.

Judges CARPENTER and STADING concur.