STATE OF NORTH CAROLINA v. NATOSHA RENEE WATSON

No. COA04-855

(Filed 5 April 2005)

**1. Criminal law— felony stalking—constitutionality of statute**
The trial court did not err by denying defendant's motion to dismiss the charges of felony stalking even though defendant contends that N.C.G.S. § 14-277.3 is unconstitutional both on its face and as applied to defendant, because: (1) the plain meaning and common usage of the statute's words put an ordinary person on notice of what conduct is prohibited; (2) anti-stalking statutes with similar language have been upheld in other states as well; and (3) contrary to defendant's contention, a person can be placed in fear for his or her personal safety and suffer substantial emotional distress at two or more particular times in the same twenty-four hour period as more than one occasion can occur in a single day.

**2. Sentencing— verdict sheet—request to list "not guilty" first**

The trial court did not err in a multiple felony stalking case by denying defendant's request that the verdict sheet list the possible verdict of "not guilty" first, because: (1) the verdict sheet listed "not guilty" as a choice; (2) there was no reasonable possibility that the jury would have come to a different conclusion had the choice of "not guilty" been listed first; and (3) the verdict sheet wording did not improperly shift the presumption of innocence.

Appeal by Defendant from judgment entered 23 April 2003 by Judge Benjamin G. Alford in Superior Court, New Hanover County. Heard in the Court of Appeals 8 March 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Kathleen U. Baldwin and Special Deputy Attorney General William P. Hart, for the State.*

*John T. Hall, for defendant-appellant.*

WYNN, Judge.

Where the language of a statute allows a "person of ordinary intelligence a reasonable opportunity to know what [conduct] is prohibited," the statute is not unconstitutionally vague. *State v. Elam*, 302 N.C. 157, 161-62, 273 S.E.2d 661, 664-65 (1981) (citation omitted). In this appeal, Defendant challenges the constitutionalty of the felony stalking statute, (section 14-277.3 of the North Carolina General Statutes) on the grounds that it is too vague. Because we hold that applying the plain meaning and common usage to words in section 14-277.3 puts an ordinary person on notice of what conduct is prohibited, we uphold the constitutionality of section 14-277.3.

The facts at trial tended to show that: Sandra "Kay" Warren worked as an instructor in the adult basic education program at Cape Fear Community College. In the fall of 1995, Defendant Natosha Renee Watson became a student in Ms. Warren's class. The class met for six hours a day, four days a week. During this time Defendant discussed various family problems with Ms. Warren, who referred her to the mental health center.

The State's evidence tended to show that in November 1996, Defendant was taken out of Ms. Warren's class to take vocational classes recommended by her social worker. At this point, Defendant

became "very clingy and possessive" of Ms. Warren. In January 1997, Defendant told Ms. Warren that she was physically attracted to her. Defendant also started telling Ms. Warren bizarre things, such as that she had come to Ms. Warren's house when she was a little girl, that she remembered biting Ms. Warren's child, and other things that did not and could not have happened. Also around this time, Defendant told Ms. Warren that she felt Ms. Warren had made a sexual advance to her by bumping up to the back of Defendant's chair, and she also accused Ms. Warren of unbuttoning her blouse in front of Defendant.

At some point, Defendant tried to give Ms. Warren a music box with a white dove. Ms. Warren told her it was not an appropriate gift, but accepted it after Defendant became very upset. Defendant started telling Ms. Warren that other students in the class were looking at Ms. Warren in a sexual way. Defendant became very jealous of these other students and accused Ms. Warren of having a special relationship with them.

After meetings involving Defendant and senior staff members at the college, Defendant was suspended and informed she was not to have contact with Ms. Warren or come to Cape Fear Community College. On 3 February 1997, Defendant received notice of her suspension and confronted Ms. Warren in her classroom, tore up a piece of paper in her hand, and stated that "if [Ms. Warren] thought that this was sexual harassment, she was going to show [her] what sexual harassment was." Security removed Defendant from the premises.

Defendant left notes on Ms. Warren's desk at the college in January 1997. On one of them, she opened the note with "Dear Snow White" and signed it "Dopey." On another, the salutation read "Dear Beauty" and was signed "The Beast." On a note opening with "Dear Kay," Defendant signed it with her name. In addition, a colleague left a note on Ms. Warren's desk at school, which subsequently disappeared. Defendant later admitted to taking it and apologized.

In the fall of 1997, Ms. Warren started receiving telephone hang-up calls. She received approximately fifty calls in three days. Through the telephone company she was able to track the source of the calls. Detective Jerry Collins Ludlum testified that in October 1997, Ms. Warren filed a report of harassing phone calls. Detective Ludlum contacted Defendant's father, who stated he would speak with his daughter. The detective also spoke with Defendant by telephone; she admitted making the phone calls and said she would stop. Ms. Warren did not press charges at that time.

In fall of 1998, Ms. Warren frequently saw Defendant in her car driving through the campus parking lot or driving down the street as Ms. Warren walked to work. On three separate occasions in March 1999, Ms. Warren observed Defendant sitting in her car parked on the street across from Ms. Warren's house. Ms. Warren testified that at that point she "felt fear for [her] family" as well as her personal safety. Ms. Warren had never given Defendant her home telephone number or address.

Defendant began leaving notes to Ms. Warren on her car starting in fall of 1998. Ms. Warren received one message on 1 December 1998, with a picture of Defendant's son and Defendant's telephone number on it. Some of the messages had faces drawn on them and some were signed "Dopey." On 16 February 1999, Ms. Warren received a note with the words "I love you" written along with "Dopey." On 15 March 1999, she received a note that had a Bible verse with the words "Please don't forget me for I shall always love you. From your Baby Dopey." There were various other notes with similar messages left of Ms. Warren's car. A note was also left on Ms. Warren's rental car that said "Kay, nice car." Ms. Warren put dates on each note and then turned them over to Lieutenant Hovie W. Pope of the Wrightsville Beach Police Department.

Ms. Warren contacted a private attorney, Bill Boney, who wrote Defendant a letter on 13 April 1999, instructing Defendant to stop all contact with Ms. Warren.

Lt. Pope testified that he met with Ms. Warren in March 1999 and she informed him that she was having a problem with Defendant again. After seeing Defendant in her neighborhood, Ms. Warren went to see Lt. Pope. He described Ms. Warren as appearing "to be under a lot of stress, very nervous, on the verge of tears." She also expressed at this time that she feared for her and her children's safety. On 15 April 1999, Defendant was arrested for making harassing telephone calls.

From November 2001 through April 2002, Ms. Warren continued receiving hang-up calls and romantic messages at work, totaling over 175 calls. By this time, a block had been placed on Ms. Warren's home telephone. A caller identification box was installed at the college. On 12 November 2001, a message in Defendant's voice stated "I'm sorry. I was trying to reach my lover." In January of 2002, several messages were left on the office answering machine saying "I want you" while another said "I'm sorry I made you hate me, Kay. Please try to remem-

ber me, Kay." Yet another message stated "I'm sorry I'm not good enough for you, Kay." On 8 January 2002, a message consisted of a kissing sound and another included the words, "I want to kiss you again, Kay." Calls from Defendant continued into February including three calls on 22 February 2002 and six calls on 25 February 2002. On 26 February 2002, Ms. Warren took a call from Defendant and told her to stop calling. Defendant responded that she would not. She then left a telephone message, stating that Ms. Warren "did not know who [she] was dealing with, that not to mess with her." ·

On 7 January 2002, Ms. Warren again went to the Wilmington Police Department in regards to Defendant's conduct. Cape Fear Community College hired security guards to sit outside Ms. Warren's door and walk her to her car.

In February and April 2002, Ms. Warren filed complaints with the magistrate based on the phone calls. Calls continued to be made to Ms. Warren in April, May, and June 2002. The cassette tapes from the answering machine were introduced into evidence at the trial. During some calls, Defendant said things like "What do you think I'm going to do? Get a gun and come down and shoot you?" Throughout this time, Ms. Warren suffered from stress-related headaches.

At trial, Defendant admitted to making phone calls in April, May, and June 2002. She testified that when Ms. Warren explained that if she had brushed up against Defendant, it was not any kind of sexual advance, she felt hurt. She admitted making a statement to Ms. Warren that she did not want the relationship to end in a violent way; there were times she had gotten very angry at Ms. Warren; she had told Ms. Warren she was sexually attracted to her; she made repeated phone calls even after being told by school officials and the police to stop; and she followed Ms. Warren in her car and left notes on Ms. Warren's car, including the ones presented to the jury as exhibits.

Defendant further testified she loved Ms. Warren and was afraid of losing her. She admitted she had been told by a judge not to contact Ms. Warren following her earlier misdemeanor stalking conviction as a condition of her probation. She acknowledged telling Ms. Warren that "people like you cause people to loose (sic) their mind and their sanity, making people want to kill them." She also admitted saying "Each day a little bit of my mind dies . . . You know what happens when people start loosing (sic) their mind, they're capable of doing anything."

On 26 August 2002, Defendant was indicted for twelve counts of felony stalking. Before trial, Defendant moved to dismiss the charges challenging the constitutionality of the statute. The trial court denied Defendant's motion to dismiss. During trial, four of the counts were dismissed. The jury found Defendant guilty of all remaining charges. The trial court sentenced Defendant to four consecutive sentences of nineteen to twenty-three months imprisonment. Four other consecutive sentences of nineteen to twenty-three months imprisonment were suspended. Defendant appealed.

---

On appeal, Defendant argues that the trial court erred in (1) denying her motion to dismiss because the statute is unconstitutional; and (2) denying Defendant's request that the verdict sheet list "not guilty" as the first choice. We uphold the trial court's judgment.

### I. Constitutionality of Statute

[1] Defendant contends that the felony stalking statute is unconstitutional both on its face and as applied to Defendant. The felony stalking statute, section 14-277.3(a) of the North Carolina General Statutes, defines the offense of stalking as:

A person commits the offense of stalking if the person willfully on more than one occasion follows or is in the presence of, or otherwise harasses, another person without legal purpose and with the intent to do any of the following:

(1) Place that person in reasonable fear either for the person's safety or the safety of the person's immediate family or close personal associates.

(2) Cause that person to suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment, and that in fact causes that person substantial emotional distress.

N.C. Gen. Stat. § 14-277.3(a) (2004). Furthermore, the statute defines the terms "harasses" and "harassment" as:

'[H]arasses' or 'harassment' means knowing conduct, including written or printed communication or transmission, telephone or cellular or other wireless telephonic communication, facsimile transmission, pager messages or transmissions, answering machine or voice mail messages or transmissions, and electronic mail messages or other computerized or electronic transmis-

sions, directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose.

N.C. Gen. Stat. § 14-277.3(c) (2004).

### A. Facial Challenge

Defendant argues that section 14-277.3 of the North Carolina General Statutes is unconstitutionally vague as it "fails to provide sufficient notice of both unlawful and lawful actions within the intent of the legislation." (Def. B. 7). This is an issue of first impression as North Carolina courts have not yet examined the constitutionality of this statute.

Statutes are presumed constitutional as we are guided by the following principle: "[e]very presumption favors the validity of a statute. It will not be declared invalid unless its unconstitutionality be determined beyond reasonable doubt." *Baker v. Martin*, 330 N.C. 331, 334, 410 S.E.2d 887, 889 (1991) (citation omitted). "If a statute is susceptible to two interpretations, one constitutional and the other unconstitutional, the former will be adopted." *State v. Dorsett*, 3 N.C. App. 331, 335, 164 S.E.2d 607, 609 (1968). Also, a statute is construed to ensure that the purpose of the legislature is carried out. *State v. Thompson*, 157 N.C. App. 638, 644, 580 S.E.2d 9, 13, *disc. review denied*, 357 N.C. 469, 587 S.E.2d 72 (2003). Additionally, in construing a statute, undefined words should be given their plain meaning. *Id.* at 644-45, 580 S.E.2d at 13.

If a statute fails to clearly define that which is prohibited, courts must declare the statute unconstitutionally vague. The void for vagueness test is whether the statute in question gives a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Elam*, 302 N.C. at 161-62, 273 S.E.2d at 664-65 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 33 L. Ed. 2d 222, 227, 92 S. Ct. 2294, 2298-99 (1972)).

In her brief, Defendant specifically contends the following phrases are vague: "legal purpose," "occasion," "substantial emotional distress," "torments," and "terrorizes." Several of these words are of common usage and their plain meaning should be given. *Thompson*, 157 N.C. App. at 644-45, 580 S.E.2d at 13. "Torment" is defined as "[t]o annoy, pester, or harass." THE AMERICAN HERITAGE COLLEGE DICTIONARY 1428 (3d ed. 1997). "Terrorize" is defined as "[t]o fill or overpower with terror; terrify." AMERICAN HERITAGE COLLEGE DICTIONARY 1401 (3d ed. 1997); *see also State v. Taylor*, 128 N.C. App.

616, 619, 495 S.E.2d 413, 415 (1998) (animal control ordinance upheld as terms "through their daily use become meaningful so that the average person should have a sense of what is prohibited."). This Court has previously defined the word "occasion" as its commonly understood meaning: "a particular time at which something takes place: a time marked by some happening." *Gaither v. Peters*, 63 N.C. App. 559, 561, 305 S.E.2d 763, 764 (1983) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY) (interpreting the meaning of occasion in a traffic offense statute). Applying the commonly understood meaning to the term "occasion," it is clear the General Assembly intended to prevent a person from willfully stalking another at more than one particular time. Using the plain meaning of these terms, we hold that an ordinary person can reasonably understand what conduct is prohibited.

Moreover, anti-stalking statutes with similar language have been upheld in other states as well. In *Pallas v. State*, 636 So. 2d 1358 (Fla. Dist. Ct. App. 1994), *approved by*, 654 So. 2d 127 (Fla. 1995), a Florida court held that a similarly worded anti-stalking statute was not unconstitutionally vague. *Id.* at 1361. Under the Florida statute, " 'Harasses' means to engage in a course of conduct directed at a specific person that causes substantial emotional distress in such person and serves no legitimate purpose." *Id.* (citing Fla. Stat. ch. 784.048(1)(a) (Supp. 1992)). The defendant in *Pallas* argued that this definition created a subjective standard. However, the court held that the statute in fact created a "reasonable person" standard and gave fair notice of the conduct which is proscribed. *Id. See also People v. Tran*, 54 Cal. Rptr. 2d 650 (Cal. Ct. App. 1996) (stalking statute upheld as to the vagueness challenge); *People v. White*, 536 N.W.2d 876 (Mich. Ct. App. 1995) (same). We agree with the Florida court in *Pallas*. Section 14-277.3 of the North Carolina General Statutes creates a "reasonable person" standard and puts an ordinary person on notice of prohibited conduct. Thus, we conclude that section 14-277.3 is not unconstitutionally vague.

### B. As-Applied Challenge

Defendant also contends that section 14-277.3 is unconstitutional in its application to her as each indictment alleged that the offense took place on one specific day. We disagree.

Each of the eight indictments for felony stalking lists for the "date of the offense" an individual day twice (*e.g.* "4-13-02, 4-13-02"). Defendant argues that listing only one day on the indictment is

an unconstitutional application of N.C. Gen. Stat. § 14-277.3, as the statute provides for the offense of stalking if "the person willfully *on more than one occasion* . . . ." N.C. Gen. Stat. § 14-277.3(a) (emphasis added).

However, as we have previously stated, "occasion" will be given its common usage meaning: "a particular time at which something takes place: a time marked by some happening." *Gaither*, 63 N.C. App. at 561, 305 S.E.2d at 764. Assuredly, a person can be placed in fear for their personal safety and suffer substantial emotional distress at two or more particular times in the same twenty-four hour period. As "more than one occasion" can occur in a single day, we conclude that N.C. Gen. Stat. § 14-277.3 was not unconstitutional as applied to Defendant.

## II. Verdict Sheet

[2] Finally, Defendant argues that the trial court erred in denying her request that the verdict sheet list the possible verdict of "not guilty" first. We disagree.

There is no rule in North Carolina indicating the order choices must be listed on verdict sheets. Nor does Defendant cite any authority supporting this proposition. In *State v. Hicks*, 86 N.C. App. 36, 356 S.E.2d 595 (1987), this Court found no error by the trial court where the choice of "not guilty" was not included on the verdict form. *Id.* at 43, 356 S.E.2d at 599. The jury had to write in either "guilty" or "not guilty." *Id.* This Court stated that although "the use of 'not guilty' on the verdict sheet is preferred we conclude that there is no reasonable possibility that the outcome would have differed if the jury verdict sheet had been worded differently." *Id.*

Here, the verdict sheet listed "not guilty" as a choice. Similar to our holding in *Hicks*, we conclude here that there is no reasonable possibility that the jury would have come to a different conclusion had the choice of "not guilty" been listed first.

Nor did the verdict sheet wording improperly shift the presumption of innocence. In charging the jury, the trial court stated "[u]nder our system of justice, when a defendant pleads not guilty, she is not required to prove her innocence but is presumed to be innocent." "We presume 'that jurors . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.'" *State v. Squires*, 357 N.C. 529, 536, 591 S.E.2d 837, 841 (2003) (quoting

*Francis v. Franklin,* 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985)). Accordingly, the trial court properly charged the jury that Defendant was presumed to be innocent, regardless of the order of possible choices on the verdict sheet.

For the foregoing reasons, there was no error by the trial court.

No error.

Judges TYSON and ELMORE concur.