STATE OF NORTH CAROLINA
v.
JEFFERY WARE, Defendant.
No. COA08-581.
Court of Appeals of North Carolina.
Filed April 21, 2009.
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Amy C. Kunstling, for the State.
Haral E. Carlin for defendant-appellant.
GEER, Judge.
Defendant Jeffery Ware appeals his conviction of stalking under N.C. Gen. Stat. § 14-277.3 (2007), arguing the trial court should have granted his motion to dismiss as there was insufficient evidence to submit the charge to the jury. When the evidence is viewed in the light most favorable to the State, as mandated by our standard of review as to a motion to dismiss, we conclude that the State presented substantial evidence of each essential element of the offense, and, therefore, the trial court did not err in denying defendant's motion. Accordingly, we find no error.

Facts
The State's evidence tended to show the following facts. In November 2005, Sherry Brooks began working full-time at the Windsor Square Exxon gas station and convenience store in Matthews, North Carolina. Her manager, Gerard Vaidagna, would stay in the store's office, while she was alone in the store, working behind the counter, serving customers, stocking inventory, and making coffee.
Ms. Brooks had never met defendant before he started coming into the store. At first, defendant bought beer, but he later switched to buying coffee after the store refused to sell him beer on one occasion when he appeared to be intoxicated. Defendant never bought anything other than beer or coffee.
Beginning in the spring or summer of 2006, defendant began coming into the store eight to 10 times a day during Ms. Brooks' shift. Defendant would buy a cup of coffee every time he came into the store and then stand in the coffee section, roughly six or seven feet away from the register where Ms. Brooks was working. He would stare at Ms. Brooks' body, particularly her "butt," waiting until all other customers had left the store. Once they were alone in the store, defendant would approach Ms. Brooks and try to talk to her, telling her how beautiful she was and how he wanted to hold her and not let go. Ms. Brooks found defendant's comments to be "creepy," and they made her feel "[v]ery uncomfortable." When she left work, she started worrying that defendant might follow her home. Ms. Brooks never told defendant anything personal about herself and never made any romantic advances toward him.
Ms. Brooks told Mr. Vaidagna that she was concerned about defendant's behavior. Mr. Vaidagna then began noticing that defendant would walk or drive by the Exxon repeatedly, but would not come in the store if Ms. Brooks was not visible. Mr. Vaidagna also observed that defendant would "get a different look in his eye" when Ms. Brooks talked with other male customers. On occasion, after Ms. Brooks spotted defendant in the parking lot, she would run into the back of the store and ask Mr. Vaidagna to ring up defendant's coffee.
On 4 August 2006, defendant gave Ms. Brooks two greeting cards. The first card had a picture of a puppy on the front with the message inside of "I'd follow your tail anywhere." Defendant had written on the card: "The most precious sweetest looking angel thats [sic] ever existed/Your heartthrob/Jeff." Defendant also provided his address and phone number in the card, stating: "In case you may ever want to get in contact with me. I mostly leave the phone disconnected because I get alarmed real easy[.]" The second card had a picture of two mice sitting in a swing touching noses with the words, "Wish I may, wish I might . . . Kiss you morning, noon, and night! I just can't get enough of you." Defendant wrote inside: "Hottie/Sincerely/Head over heels/Jeff."
The cards made Ms. Brooks feel very nervous and even more concerned about defendant. She showed the cards to Mr. Vaidagna, and the police were called. Defendant was also given a letter of trespass banning him from coming into the store. Defendant became angry when he was escorted from the premises, refused to sign the letter of trespass, and threw it in the trash.
On 11 August 2006, a week after defendant gave Ms. Brooks the cards, he was arrested for stalking. On 25 August 2006, Ms. Brooksreceived a 44-page letter written by defendant while he was still in jail. Defendant's letter made Ms. Brooks "very scared," "worried that [defendant]'s dangerous," and "a little angry." Ms. Brooks subsequently obtained an order prohibiting defendant from contacting her.
Subsequently, Ms. Brooks received a call from Elizabeth Livingston, a substitute teacher in Charlotte, whom Ms. Brooks did not know. Beginning in July 2006, Ms. Livingston had been receiving two to three letters a day from defendant in which he talked about Ms. Brooks physically and sexually and "characterized [Ms. Brooks] as kind of responsible for his behavior." After receiving the call from Ms. Livingston, Ms. Brooks became "very much more concerned" than she had been.
Defendant was indicted for stalking under N.C. Gen. Stat. § 14-277.3.[1] Because defendant had previously been convicted of stalking in Florence County, South Carolina, on 3 August 2005, he was prosecuted for a Class F felony under N.C. Gen. Stat. § 14-277.3(b). The jury convicted defendant of stalking, and the trial court sentenced him to a presumptive-range sentence of 23 to 28 months imprisonment. Defendant timely appealed to this Court.

Discussion
Defendant's sole argument on appeal is that the trial court erred in denying his motion to dismiss the stalking charge for insufficient evidence. When we review a trial court's denial of a motion to dismiss, "the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). "If so, the motion is properly denied." Id. Substantial evidence is that amount of evidence "sufficient to persuade a rational juror to accept a particular conclusion." State v. Goblet, 173 N.C. App. 112, 118, 618 S.E.2d 257, 262 (2005). We view the evidence in the light most favorable to the State. Id.
A person commits the offense of stalking under N.C. Gen. Stat. § 14-277.3:
if the person willfully on more than one occasion follows or is in the presence of, or otherwise harasses, another person without legal purpose and with the intent to do any of the following:
(1) Place that person in reasonable fear either for the person's safety or the safety of the person's immediate family or close personal associates.
(2) Cause that person to suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment, and that in fact causes that person substantial emotional distress.
Thus, the statute requires proof that (1) the defendant acted willfully; (2) he followed, was in the presence of, or otherwise harassed another person on more than one occasion; (3) he did so without legal purpose; and (4) he did so with the intent and effectset forth in either subsection (1) or (2). In this case, the indictment alleged that defendant acted for the purpose of placing Ms. Brooks in reasonable fear for her safety as set forth in N.C. Gen. Stat. § 14-277.3(a)(1).
N.C. Gen. Stat. § 14-277.3(c) defines the terms "harasses" or "harassment" to mean, in pertinent part, "knowing conduct, including written or printed communication . . . directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose." This Court, in turn, has defined "torment," as used in this definition, "as `[t]o annoy, pester, or harass.'" State v. Watson, 169 N.C. App. 331, 337, 610 S.E.2d 472, 477 (2005) (quoting The American Heritage College Dictionary 1428 (3d ed. 1997)). The term "terrorize" is "defined as `[t]o fill or overpower with terror; terrify.'" Id. (quoting The American Heritage College Dictionary 1401).
Defendant argues that the State failed to prove stalking because "[t]he State failed to show the defendant willfully on more than one occasion harassed the victim with the intent to place her in fear of her safety." Defendant contends that the only evidence of stalking was "two non-threatening greeting cards" and a "letter of apology." Defendant's brief, however, acknowledges only a fraction of the evidence presented by the State and would require this Court to view the evidence in the light most favorable to defendant, contrary to the applicable standard of review.
The State presented evidence, when viewed in the light most favorable to it, that over a three-month period, defendant was observed walking and driving obsessively in front of the Exxon, entering only when he saw Ms. Brooks inside. During Ms. Brooks' shift, defendant would visit the Exxon eight to 10 times a day. He stood six to seven feet away from Ms. Brooks and stared at her body. When Ms. Brooks talked to another male customer, "[h]e would get a different look in his eye." If the store was empty of other customers, defendant would make comments to Ms. Brooks about her appearance and say that he wanted to hold her and never let her go, even though, apart from his visits at the Exxon, he did not know her and had no contact with her.
Although defendant was only a customer, he gave Ms. Brooks two greeting cards applicable to romantic relationships. One card stated that defendant "[w]ish[ed]" he could "[k]iss [her] morning, noon, and night" and that he could not "get enough of" Ms. Brooks. A second card stated that defendant would "follow" Ms. Brooks' "tail anywhere." Defendant had written his contact information at a local motel on the card, but warned in a note: "I mostly leave the phone disconnected because I get alarmed real easy[.]"
After being arrested, defendant sent Ms. Brooks a 44-page letter from jail, describing over and over again his feelings for Ms. Brooks and what she had done to show that she reciprocated those feelings.[2] Defendant acknowledged that Ms. Brooks had said that she is afraid of him, but told her not to "point the finger" at him. Although he claimed that he had no reason prior to this arrest to know that she was afraid, he admitted that he knew she was apprehensive.
Towards the beginning of the letter, he wrote:
I want you to know I love you and cherish you more deeply, completely and are totally committed to my devotion love ever lasting to you than [sic] I've ever had such sweet feeling toward any girl in my entire life. . . . So I became very defensive, furious[;] I get extremely blinded when my feeling[s] get destroyed for what I perceive to be taunting without merit or any regard for my feeling rational of reasoning or logic [sic]. I just have one most very pertinent question[:] how do I live without you. Look at yourself in the mirror, when you have looked at me with those adoring eyes as if you were pleading some times longing craving my affection my heart sank melting away. When you would go on with this what I perceived to be intense affection puckering, pouting your lips out fully extented [sic] for lengthy moments making these sweet heavenly cooing noises ooh ooh while your softest sweetest tenderest face in the world just oozes with affection dripping heavenly affection, while your face melted together meshing while also your eyes seem to tear[.]
In the following pages, he discussed how "deeply hurt" he was and announced: "Doom enpending [sic] disaster, catastrophie [sic], my anxiety comes from need of affection and love." He stated repeatedly that he was "horrified to die without" her. He also interspersed his descriptions of various encounters he had with Ms. Brooks at the store with descriptions of his criminal record, including numerous assault on a female charges and prior stalking and harassment charges.
Defendant asserted in this letter that "[m]ost judges think I have severe mental problems on top of alcohol abuse" and that alcohol "doesn't make [him] feel good anymore[,] mostly paranoid." After describing how easily Ms. Brooks could be killed by "a crackhead" for five dollars, he added: "You got a very dangerous job and people today ain't got no fucking sense, and your behavior is very questionable by allowing this to happen to me when I sincerely believed you loved me and yalled [sic] care about me and had no reason to believe your emotions had changed toward me. People don't need much of a reason."
He then, on page 17 of the letter, wrote: "You can murder with your tongue really destroy a person leaving them fallen to their demise." He invoked the Bible and said that "[t]he sowing of discord among breathren [sic] is an abomination to God and it talks about false witnesses that speaks lies as well." In the next sentence, he referenced Elizabeth Livingston, the fact that he had been charged with stalking her, and his claim that the charge had been dismissed after several years. After noting that he had a "crush" on Ms. Livingston since age 21, he described over the span of more than a half page precisely how to reach her house and gave her address.
Given defendant's purposeful conduct in repeatedly visiting the Exxon during Ms. Brooks' shift, his behavior and comments to her in the store, and ultimately his letter written from jail, a reasonable juror could find that defendant was "willfully on more than one occasion . . . in the presence of" or "otherwise harasse[d]" Ms. Brooks. Defendant, however, contends that the evidence is insufficient to establish that he was in Ms. Brooks' presence without lawful purpose since he was a regular customer of that Exxon station. On the other hand, the evidence that defendant was visiting the Exxon station eight to 10 times a day, only when Ms. Brooks was working, would allow a reasonable juror to find that he was not going to the Exxon for the lawful purpose of buying coffee, but instead went there to stare at and interact with Ms. Brooks. Defendant's 44-page letter confirms the latter purpose  indeed, one of the apparent points of the letter was to argue that Ms. Brooks must have known that he was only at the store because of his feelings for her. He even pointed out that she could not have actually believed, on one particularly hot day, that he was there to purchase hot coffee.
Defendant stresses that, in any event, "he had never been asked to leave the store, [and] he had never been asked by the victim to leave her alone or not to come back to the store while she was working . . . ." Contrary to defendant's suggestion, N.C. Gen. Stat. § 14-277.3 does not require that a person be given a warning or request to desist the offending conduct. See State v. Ferebee, 128 N.C. App. 710, 713-14, 499 S.E.2d 459, 461 (1998) (observing that stalking statute had been amended to no longer include reasonable warning requirement).
In further arguing that defendant did not harass Ms. Brooks, defendant mistakenly focuses only on the two greeting cards, disregarding the multiple visits each day, the staring, and the unwanted comments. Although defendant dismisses the 44-page letter from jail as "a letter of apology," the text of the letter could reasonably be read not only as further harassment, but also as being threatening. A reasonable juror was not required, given the extraordinary nature of this letter, to conclude that it had a legitimate purpose of apologizing.
With respect to N.C. Gen. Stat. § 14-277.3(c)'s definition of harassment as knowing conduct "directed at a specific person that torments, terrorizes, or terrifies that person," Ms. Brooks' testimony regarding the impact on her is sufficient to allow the jury to find that defendant's conduct and communications tormented and terrified her. Although defendant contends that a letter sent from a jail could not have terrified Ms. Brooks, that argument was for the jury to resolve. A reasonable jury could take into account a possible fear that defendant might act after being released. As he noted in his jailhouse letter, he had served less than two years as a result of a prior stalking conviction and had reportedly managed to have a second stalking charge dismissed.
Finally, defendant argues that the record contains insufficient evidence that "defendant intended to place the victim in reasonable fear for her safety." It is well established that "`[i]ntent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred.'" State v. Brown, 177 N.C. App. 177, 188, 628 S.E.2d 787, 794 (2006) (quoting State v. Bell, 285 N.C. 746, 750, 208 S.E.2d 506, 508 (1974), overruled in part on other grounds by State v. Collins, 334 N.C. 54, 431 S.E.2d 188 (1993)). While defendant ultimately argues that the two cards and the jailhouse letter establish "that his `intent' was never to harm," the issue is not an intent to harm, but rather whether defendant had an intent to place Ms. Brooks in fear for her safety. We hold that the State made the necessary showing.
On one of the cards, defendant made a point of stressing to Ms. Brooks that "I get alarmed real easy," a statement that a reasonable juror could find to be an implicit threat. A juror could further find the jailhouse letter to be threatening, as it accused Ms. Brooks of, in essence, leading him on and blamed her for his actions; warned about his reaction to rejection, including being "furious"; claimed he could not live without her; asserted that judges believed he had "mental problems"; and explained that alcohol made him paranoid. The jury could further decide that defendant was making an implicit threat to Ms. Brooks when he pointed out that she had a very dangerous job where she could be killed by someone walking in; when he made repeated references in the letter to his criminal history, including numerous charges of assault on a female; and when he claimed that he had successfully gotten Ms. Livingston's stalking charge dismissed, had sent her tens of thousands of letters, and could give a detailed description of how to get to Ms. Livingston's home. Moreover, defendant repeatedly stressed in his letter that he had been released from prison after only 19 1/2 months following his prior stalking conviction.
While a jury was not required to find from all of this evidence that defendant had the intent to place Ms. Brooks in fear for her safety, the evidence was sufficient to allow it to do so. Defendant has not made any separate argument that Ms. Brooks' fear was unreasonable. Accordingly, we hold that the State presented sufficient evidence of each element of the crime of stalking as set out in N.C. Gen. Stat. § 14-277.3. The trial court, therefore, properly denied the motion to dismiss.
No error.
Judges McGEE and BRYANT concur.
Report per Rule 30(e).
NOTES
[1] This statute was repealed by 2008 N.C. Sess. Laws 167, § 1, effective 1 December 2008. A new statute, N.C. Gen. Stat. § 14-277.3A, applies to offenses occurring on or after 1 December 2008. 2008 N.C. Sess. Law 167, § 3.
[2] It appears that after 23 pages, the letter starts over from the beginning essentially verbatim.