STATE OF NORTH CAROLINA v. CHERRON WOOTEN

No. COA09-1551

(Filed 17 August 2010)

**Stalking— misdemeanor stalking—sufficient evidence— motion to dismiss properly denied**

The trial court did not err in denying defendant's motion to dismiss the charge of misdemeanor stalking as there was substantial evidence presented on each essential element of the offense, including that defendant harassed the victim "on more than one occasion," acted "without legal purpose," and intended to place the victim in reasonable fear.

Appeal by Defendant from judgment entered 19 February 2009 by Judge Arnold O. Jones, II in Wayne County Superior Court. Heard in the Court of Appeals 12 April 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Diane Martin Pomper, for the State.*

*Kimberley P. Hoppin, for Defendant.*

BEASLEY, Judge.

Cherron Wooten (Defendant) appeals from judgment entered on his conviction of misdemeanor stalking and argues that the trial court erred in denying his motion to dismiss on the ground of insufficient evidence. Because we conclude that, in the light most favorable to the State, there was substantial evidence presented on each essential element of the offense, we hold the trial court did not err in denying Defendant's motion to dismiss.

On 17 January 2007, Defendant was charged with misdemeanor stalking for harassing Danny Keel on specific occasions between 1 November 2006 and 16 January 2007. The Wayne County District Court found Defendant guilty, and he appealed to Superior Court. Keel had become the building inspector for the Town of Mt. Olive at the time Defendant was constructing a building on property he owned in the town. Keel had never met Defendant before receiving a call from him in the spring of 2006. During that conversation, Defendant revealed his desire to operate a florist, whereupon Keel told him that the property was located in a residential area and did not have the zoning necessary for a commercial building. Keel did not

hear from Defendant for a few months thereafter, but beginning 1 November 2006, Defendant sent the first of several faxes to the town offices, complaining generally about discriminatory treatment he was receiving, with primary emphasis on Keel.

The first fax was addressed to the Town of Mt. Olive (town), and not to Keel specifically, but refered to Keel's secretary by name and mentioned "the inspector." The letter indicated that Defendant, "with the permission of the Ku Klux Klan Members of Mt. Olive" wanted to change the classification of his building. Keel replied by letter two days later, informing Defendant that changing his building's classification should not be a problem and apprised him of the steps Defendant needed to take to comply with the North Carolina Building Code. Keel testified that the conditions placed on Defendant in order to proceed were not Keel's own rules but those imposed by the town zoning ordinance and state building code.

The second fax sent by Defendant, while addressed to the NAACP, was faxed to the town offices on 7 December 2006 and refered almost exclusively to Keel. Defendant wrote that "Danny Kill [sic] holds a public position only because he's a white man" and that he "has stirred up problems in the black community with his Keel-a-Niger [sic] attitude." This fax used the moniker "Mr. Kill-a-Niger," or similar variant thereof, multiple times, and Keel believed that the "ugly name" was addressed to him. Keel testified that he "was really, really becoming concerned about [Defendant's] attitude and the names he was calling [him]." Defendant sent a third fax to town hall after Keel and Wayne County inspector, Joe Nassef, conducted an electrical inspection of Defendant's building and noted three problems that needed to be cured. This fax, received from Defendant on 19 December 2006, stated that Keel had a personal problem with Defendant and "has persuaded Joe Nasive [sic] to join forces with him." Defendant further indicated that he had to buy a shotgun to protect himself from them. Although the fax listed no addressee, Keel believed it was directed to him because the first line in the body of the fax addressed him and Mr. Nassef. Keel testified that he was "very threatened" by Defendant's reference to a shotgun and that he and his family were frightened by the continuous faxes with Keel's name in them.

Defendant's fourth fax was received at town hall on 11 January 2007 but addressed to "Danny E. Keel," listing Keel's home address and home phone number at the top. This fax was also copied to "Mr.

Keel-a-Nigger" and referenced both that name and "Danny Keel" in the body of the letter, much of which was written in bold and enlarged type and repeatedly accused Keel of lies and discrimination. Keel testified that this fax led him to be fearful, not only for himself, but also for other town employees that had been involved in the situation because it referenced several of them therein. At that point, all of the county inspectors were informed not to go to Defendant's building anymore "because of the threatening letters that were being received." Keel testified that in Defendant's final fax before charges were brought, Defendant's name and phone number appeared at the top, but Defendant also used the pseudonym, "The Gay-Ku-Klux-Klan-Fax-Man," to indicate from whom the fax was sent. The first two addressees are "Mr. Keel-a-Nigger" and Danielle, Keel's daughter who was living in Greenville while attending East Carolina University (ECU) at the time. Although Defendant wrote "[t]his is no threat to you," his letter specifically referenced Keel's mother and father and frightened Keel and his wife regarding their daughter's safety. The language also alluded to Defendant's family being joined with Keel's by mentioning Keel's widowed mother and stated that allowing his building to sit would give him time "to learn you, your family and your Mama." Defendant wrote that this attitude was his response to Keel having "pissed in [his] cornflakes." Keel filed charges that day.

Defendant represented himself but did not testify, and made motions to dismiss the charge for lack of evidence at the close of the State's evidence and again at the close of all the evidence, both of which were denied by the trial court. The jury found Defendant guilty of stalking, and he timely appealed to this Court.

Defendant's sole argument on appeal is that the trial court erred in denying his motion to dismiss, claiming that the State presented insufficient evidence that he committed the offense of stalking. Defendant contends that the State failed to present sufficient evidence that Defendant harassed Keel "on more than one occasion," acted "without legal purpose," and intended to place Keel in reasonable fear. We disagree.

In reviewing a motion to dismiss which challenges the sufficiency of the evidence, "the question for this Court is whether there is substantial evidence of each essential element of the offense charged." *State v. Borkar*, 173 N.C. App. 162, 165, 617 S.E.2d 341, 343 (2005). "If so, the motion is properly denied." *State v. Powell*, 299 N.C. 95, 98,

261 S.E.2d 114, 117 (1980). " 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *State v. Frogge*, 351 N.C. 576, 584, 528 S.E.2d 893, 899 (2000) (quoting *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980)).

> In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. . . . Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts, *taken singly or in combination*, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.

*State v. Barnes*, 334 N.C. 67, 75-76, 430 S.E.2d 914, 918-19 (1993) (internal quotation marks and citations omitted).

Defendant was charged and convicted for stalking under N.C. Gen. Stat. § 14-277.3, which provides that the offense of misdemeanor stalking occurs when a person

> willfully on more than one occasion follows or is in the presence of, or otherwise harasses, another person without legal purpose and with the intent to do any of the following:
>
> (1) Place that person in reasonable fear either for the person's safety or the safety of the person's immediate family or close personal associates.
>
> (2) Cause that person to suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment, and that in fact causes that person substantial emotional distress.

N.C. Gen. Stat. § 14-277.3(a) (2007).[1] The warrant for Defendant's arrest alleged that he acted for the purpose of causing Keel to reasonably fear the safety of himself, his immediate family, and his close personal associates. Therefore, where there was no allegation that Defendant followed or was in the presence of Keel, the State was

---

1. This statute was repealed by 2008 N.C. Sess. Law 167, § 1, effective 1 December 2008. A new statute, N.C. Gen. Stat. § 14-277.3A, applies to offenses occurring on or after 1 December 2008, 2008 N.C. Sess. Law 167, § 3, but the version in effect in 2006 and thus relevant to this appeal is cited here.

required to prove that Defendant (i) acted willfully; (ii) harassed Keel on more than one occasion; (iii) without legal purpose; and (iv) intended to place Keel in reasonable fear, as set forth in subsection (1). *See* N.C. Gen. Stat. § 14.277.3(a)(1).

Defendant first argues that the State presented insufficient evidence that Defendant harassed Keel on more than one occasion.

The applicable statute defines "harasses" or "harassment" to mean "knowing conduct, including . . . facsimile transmission . . . directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose." N.C. Gen. Stat. § 14-277.3(c). Our Court has further defined several of the terms used in the statutory definition, including "torment," as "[t]o annoy, pester, or harass," and "terrorize," as "[t]o fill or overpower with terror; terrify." *State v. Watson*, 169 N.C. App. 331, 337, 610 S.E.2d 472, 477 (2005) (internal quotation marks omitted) (quoting *The American Heritage College Dictionary* 1428, 1401 (3d ed. 1997)).

Defendant contends that none of his first four faxes could constitute harassment in this case because they were not directed specifically at Keel. Defendant argues that only the final fax of 16 January 2007 was actually addressed to Keel, presenting just a single occasion of potential harassment, and thus, falls outside the scope of § 14-277.3. The penultimate fax, however, was clearly "directed" at Keel as well. Although this fax was purportedly "To: W. Carrol Turner," the town attorney, it is Keel's mailing information and telephone number that appears at the top in the inside address, which is commonly used to identify the recipient to whom a letter should be routed. Moreover, the fax was copied to "Mr. Keel-a-Nigger" and focuses on Keel throughout. While these two faxes alone constitute the "more than one occasion" necessary to come within the confines of the statute, the second and third faxes—although respectively addressed to the NAACP and an unnamed person—were also transmitted to town hall and refer mostly to Keel. Notwithstanding the fact that the first fax merely mentions "the inspector" and, instead, focuses on Keel's secretary, each fax refers to Keel in some unfavorable way. When the address lines are considered in context with the body of these faxes, it is clear that the State presented substantial evidence for a reasonable juror to conclude, beyond a reasonable doubt, that Defendant directed most, if not all, of these communications to Keel.

The text of section 14-277.3 requires that the communication at issue "torment[], terrorize[], or terrif[y]" the person to whom the communication is directed. N.C. Gen. Stat. § 14-277.3(c). This section, as applied by our courts in the criminal context, generally has involved some type of habitual stalking with numerous instances of contact over a period of time. *See State v. Stephens*, 188 N.C. App. 286, 655 S.E.2d 435 (defendant convicted of felony stalking after following and otherwise harassing victim), *disc. rev. denied*, 362 N.C. 370, 662 S.E.2d 389 (2008); *Borkar, supra* (defendant's motion to dismiss charge of misdemeanor stalking properly denied when there was evidence defendant had, *inter alia*, watched the victim and her family and recorded their license tag numbers); *State v. Watson*, 169 N.C. App. 331, 610 S.E.2d 472 (2005) (conviction for felony stalking found constitutional and upheld when defendant had been leaving notes, calling, and driving by victim for approximately five years).

Defendant next argues that none of these first four faxes tormented, terrorized, or terrified Keel and thus could not be deemed "harassment." After testifying to having been "caught by surprise" by the first fax, Keel said that the second fax, when Defendant began to call Keel "an ugly name," caused him to become very concerned about Defendant's attitude. As to the third fax, which included Defendant's reference to purchasing a shotgun, Keel testified that he felt very threatened for himself, Mr. Nassef, and his family. He stated:

> Well, if you have someone that says they're going to buy a shotgun, you don't know what they're going to do. You don't know whether they're going to be waiting in an alley for you or something . . . it just really put me in a bad position, and it also put my family in a bad position . . . and we became somewhat frightened because of this [sic] continuous faxes that were, you know, coming with my name on it, you know; it just really concerned me.

Keel described his concerns generated by the fourth fax, addressed to Keel's home, where he lived with his wife and children:

> Well, once again, it just has a lot of—a lot of reference in there directed to me that led me to be threatened, and led to me to be fearful, not only myself, but other town employees that have been involved in the situation. It references the town manager, the mayor, the county inspectors, the city inspector, Kenny Talton, and, you know, it just really—made me feel at—you know, I mean I was upset about it; I mean that was really—it was really getting bad, I thought, at this point. It was really um . . . causing me to stress.

Although Defendant does not contest that the fifth fax did not torment, terrorize, or terrify Keel, the evidence shows that this last communication clearly falls within the definition of "harassment." Keel testified that the town secretary was nearly crying when she delivered the fax to him, and after reading it Keel "was just so frightened." He said, "I just immediately was frightened for my—for my family, because the letter directly, directly addresses my family, and names my family in it. And it was just very threatening to me and it was obvious where it came from." Frightened for his daughter's safety, Keel even called ECU police and the Greenville Police Department because he "couldn't get in contact with her quick enough to find out if she was okay" and called his mother to check on her as well.

Although Defendant makes much of the fact that Keel, when cross-examined about the first four faxes individually, agreed that most did not contain a direct threat, nothing in the statutory definition of "harassment" or our Court's interpretation thereof limits the offense of stalking to direct threats. However, Keel testified that he felt that the fourth message was "an indirect threat from the overall content of the letter." In addition, Keel testified that the fourth facsimile "led [him] to be threatened, and led [him] to be fearful[.]" As to the fifth and final message, Keel said that he "was just so frightened[,]" that he "immediately was frightened for [his]—for [his] family," and that this last communication "was just very threatening to [him.]" Any discrepancy in Keel's testimony was for the jury to resolve. The State presented an abundance of evidence from which a rational juror could easily find that these last four faxes alarmed, intimidated, or terrified Keel. Keel's actions also manifest a fear provoked by the threatening facsimiles. Based upon the fourth message, Keel and his coworkers were advised no longer to visit defendant's property for inspections. Following receipt of the fifth transmission, Keel called his wife and his mother to ensure that they were safe; he also contacted the Greenville police and the ECU police because he was unable to reach his daughter, who was a student at ECU. Keel's testimony demonstrates that, on a minimum of two occasions, Keel was placed in reasonable fear for his personal safety as well as that of his immediate family members or coworkers. *See* N.C. Gen. Stat. § 14-277.3(a)(1). Furthermore, the racially-charged language of the final faxes, in addition to the references to Keel's home address and family members, served "no legitimate purpose." N.C. Gen. Stat. § 14-277.3(c).

Even though Keel admitted during cross-examination that the first four facsimile transmissions did not contain direct threats, his testimony nonetheless supported the threatening and harassing nature of the last two messages. Therefore, we conclude that, in the light most favorable to the State, Defendant, through this series of facsimile transmissions directed specifically at Keel, tormented, terrorized, or terrified Keel on more than one occasion.

Defendant next contends that the State failed to offer sufficient evidence that these allegedly harassing faxes were sent "without legal purpose," as each fax "had the legitimate purpose of responding to some action or correspondence directed to [Defendant]." We disagree.

Defendant claims that the legitimate purpose of each fax was related to the ongoing permitting and inspection process in which he was engaged with the town and, specifically, aimed to communicate the frustrations and perceived racial bias he experienced throughout. However, Defendant's contention that he intended only to report his problems with Keel or respond directly to correspondence he had received from various public officials is undermined by the fact that two of the faxes were also addressed to Keel himself and a third specified no recipient at all. Even if the communications purported to apprise other individuals of Defendant's complaints, the profane language, references to the Ku Klux Klan and impending shotgun purchase, and involvement of Keel's family, as directed at Keel in these faxes, served no legitimate purpose. Given the language used by Defendant and the haphazard manner by which these letters were sent or copied to various individuals through the town hall fax machine, a reasonable juror could find that Defendant did not truly have the legitimate purpose of raising a grievance or responding directly to correspondence he had received. Accordingly, we conclude that the State presented substantial evidence that Defendant acted without legal purpose, and the matter was appropriately left for resolution by the jury.

Finally, Defendant argues that there was insufficient evidence that Defendant intended to place Keel in reasonable fear. We disagree.

"It is well-established that " '[i]ntent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred.' " *State v. Brown*, 177 N.C. App. 177, 188, 628 S.E.2d 787, 794 (2006) (quoting *State v. Bell*, 285 N.C. 746, 750, 208 S.E.2d 506, 508 (1974)). In the context of N.C. Gen. Stat. § 14-277.3, this Court has advised that the trial courts should

"instruct the jury as to the definition of 'reasonable fear' to ensure that an objective standard, based on what frightens an ordinary, prudent person under the same or similar circumstances, is applied rather than a subjective standard which focuses on the individual victim's fears and apprehensions." *State v. Ferebee*, 137 N.C. App. 710, 717, 529 S.E.2d 686, 690 (2000).

As mentioned above, Defendant's second letter was addressed to the NAACP but also sent by fax to town hall without specifying to whom it should be distributed but focusing its contents entirely on Keel. Defendant's third fax was also transmitted to town hall without specifying an addressee but referring to Keel several times and discussing his intention to purchase a shotgun. Defendant's failure to specify any specific town hall recipient for these faxes could have led a reasonable juror to believe that Defendant's intent was not that the appropriate person learn of his grievances but that the faxes end up in Keel's hands and place him in reasonable fear. The fourth fax, responding to the town attorney's letter to Defendant but copied to Keel and addressed to his home, appears to speak to Mr. Turner. The jury, however, could have rationally concluded that Defendant would not have copied Keel on that fax or included his home address at the top unless he intended to intimidate Keel through the constant references to "Mr. Keel-a-Nigger," strong language, and use of bold, italic, underlined, and enlarged type. Finally, there is no dispute the State presented sufficient evidence that the fifth fax was intended to place Keel in reasonable fear for his safety, the safety of his immediate family, or the safety of his close personal associates.

Defendant argues that the necessary element was not Keel's potential subjective fear but, rather, Defendant's intent to cause objective reasonable fear. The State, however, presented not only Keel's own testimony as to the effect of Defendant's faxes upon him but also the testimony of Keel's wife and evidence that the town secretary was near tears as she handed Keel the last fax. Moreover, all county inspectors were informed not to go to Defendant's building after the fourth fax was received. Thus, the evidence shows that these faxes concerned individuals other than Keel and supports a finding that it was accordingly reasonable for Keel to fear for the safety of himself, his family, and close personal associates. Additionally, the State offered each fax into evidence, and they were published to the jury as exhibits, from which the jurors could objectively deduce from the communications themselves whether Keel's fear was reasonable. Finally, the trial court did indeed instruct the jury that the definition

of "reasonable fear" is "that which frightens an ordinary prudent person under the same or similar circumstances."

Viewed in the light most favorable to the State, we conclude that the evidence was sufficient to allow the jury to find Defendant had the intent to place Keel in reasonable fear for his safety or the safety of his immediate family or colleagues on multiple occasions. We note that the instant case is unique in that it presents only five points of contact, all by facsimile directed to the victim's workplace, with the accuser agreeing that the first four did not contain a direct threat. This situation diverges from those instances in which our courts historically have applied the stalking statute.

Accordingly, we hold that the State presented sufficient evidence of each element of the crime of stalking pursuant to N.C. Gen. Stat. § 14-277.3(a), in that the fourth and fifth faxes were indeed threatening, notwithstanding Keel's admission that the first four messages were not direct threats, and it was appropriate for the trial court to present the charge against Defendant to the jury. Therefore, the trial court did not err in denying Defendant's motions to dismiss.

No Error.

Chief Judge MARTIN and Judge JACKSON concur.