INMAN, Judge.
Michael Stanley Mazur and Anne-Marie Mazur[1] (collectively "Defendants") appeal from judgments following jury convictions for felony stalking. Defendants argue that the trial court erred by denying their motions to dismiss for insufficient evidence, and that the felony stalking statute, N.C. Gen. Stat. § 14-277.3A, is unconstitutional as applied to their actions because they were engaged in protected expression under the First Amendment to the United States Constitution.
This appeal arises from the culmination of vindictive neighborly behavior that spiraled out of control-beyond annoyances and pranks-and into a serious violation of privacy, dignity, and the laws of our State. After careful review of the record and applicable case law, we hold that Defendants received a trial free from error and that Defendants' constitutional rights were not violated.
Factual and Procedural History
The evidence at trial tended to show the following:
In 1996, Defendants, with their six-month-old daughter, moved into a house at 205 Dulcimer Lane, in Zebulon, North Carolina. Years later, in 2002, Wilbert and Elizabeth O'Neal began renting the house directly across the street. The two families co-existed without issue for almost ten years, until, in 2010, a noise complaint erupted into a six-year battle ending with Defendants' convictions.
On 30 March 2010, Anne-Marie confronted Mr. O'Neal at his house to ask him to turn down his music. Mr. O'Neal cursed her out and told her to get off of his property. Her response was to call the police.
Zebulon Police Officer David Wanamaker ("Officer Wanamaker") received the initial noise complaint later that day from Anne-Marie about the loud music coming from Mr. O'Neal's property. Upon arrival, Officer Wanamaker heard the music and approached Mr. O'Neal. After a short, heated discussion with Mr. O'Neal, Officer Wanamaker cited Mr. O'Neal for a violation of the local noise ordinance. This was only the first of many police complaints filed over the course of several years by both Defendants and the O'Neals.
Following the initial confrontation, Anne-Marie also decided to nickname Mr. O'Neal "froggy." She derived the nickname from Mr. O'Neal's calling her "a fat a** cracker b***h[,]" and that, according to her testimony, "Mr. O'Neal likes to talk about the size of [her] rear end, so [she] talked to Mr. O'Neal about his eyes being ugly." Defendants also placed two statues on their property facing the O'Neals' house: one of a frog-which was stated as representative of Mr. O'Neal-and the other was of a pig with its hind-end raised to the air toward the O'Neals'-which was stated as representative of Mrs. O'Neal. Anne-Marie had also begun wearing "googley-eye" glasses in an attempt to mock Mr. O'Neal's appearance.
Defendants and the O'Neals then began recording the others' comings and goings and interactions, with the use of handheld video cameras.
On 27 March 2012, with the conflict continuing to devolve, Officer Robert Prichard ("Officer Prichard") arrived to the neighborhood in response to yet another complaint, this one from Mr. O'Neal. Officer Prichard pulled into the neighborhood with his windows rolled down, a practice which became customary when responding to a complaint by either party, and heard what he said sounded like kids yelling: "Here froggy, froggy. Here froggy, froggy." When he reached the O'Neal's house, Mr. O'Neal showed Officer Prichard a series of videos from the previous few days depicting Defendants' harassment of the O'Neals. Officer Prichard then approached a third neighbor to ask about Defendants' treatment of the O'Neals; the neighbor reported hearing Defendants call Mr. O'Neal "froggy," "frog-eyed motherf***er," and "an old frog-eyed n****r."
Following the neighbor's report, Officer Prichard arrested Defendants, brought them before a Wake County magistrate, and swore out criminal warrants for ethnic intimidation. The charges for ethnic intimidation were later amended to charge Defendants with misdemeanor stalking. Along with these charges, the magistrate issued a "No Contact" order directing Defendants to have "NO CONTACT WITH ALLEGED VICITM IN ANY MANNER." Defendants were released on bond.
By the following week, Defendants had installed, throughout their yard, three high-powered surveillance cameras with infrared-night-vision capabilities.[2] The cameras were angled to continually monitor the O'Neals' house and driveway. Defendants said they set up the cameras that way to allow them to prove they never stepped foot on the O'Neals' property should they be accused of so doing. The cameras directed a constant beam of red light into the O'Neals' home, making them feel "very uncomfortable" and like they were being "watched for no reason" and "violated." Another neighbor reported feeling "uncomfortable" having the cameras pointed in their direction.
In addition to the camera surveillance, Defendants continued to make "oink" noises at Mrs. O'Neal, and in their car followed Mr. O'Neal and his son walking through the neighborhood. Michael at times also drove slowly behind the O'Neals' son while he was on his bicycle in the neighborhood.
In May 2012, six weeks after the installation of the surveillance cameras, police officers executed a search warrant on Defendants' home and seized the cameras. Along with the cameras, officers seized 1,834 hours of video recordings made in the six-week period. This level of surveillance was "[m]ore than most police operations." Police also found and seized a calendar for April 2012, which had entries about "loud music," "truck blasting," and "a**hole blast in wife's car." The calendar also included handwritten notes referring to Mr. O'Neal as "frog" and "a**hole," and Mrs. O'Neal as "pig," and noted their times of arrival and departure for many days.
After their cameras were confiscated, Defendants spent the summer preparing what they claimed were "Halloween" decorations, which they put on display beginning in October lasting through December. The decorations included eyeballs made out of Tupperware bowls, with "red lines to look like veins" and light bulbs inside. Defendants also hung eyeglasses with "google eyes" painted on them from the trees and mailbox post facing the O'Neals' property. While trick-or-treating with her children, one of the other residents in the neighborhood asked Anne-Marie about the decorations; Anne-Marie replied their intent was to convey the message that they-Defendants-"had their eyes on Mr. O'Neal."
In February 2013, several officers took note of false noise complaints filed by Defendants against Mr. O'Neal. On 20 February 2013, Officer Prichard received a call from Anne-Marie complaining about Mr. O'Neal's music. As Officer Prichard entered the neighborhood, he rolled down his windows and observed that no music could be heard.
A few weeks later, on 15 March 2013, Officer Prichard received another complaint from Anne-Marie regarding Mr. O'Neal's music. On this day, Officer Prichard actually waited around the corner with his windows rolled down to listen for music, but he heard none.
On 20 October 2014, an unmarked patrol car was following Mr. O'Neal's truck as he turned into the neighborhood and pulled into his driveway. The officer had his windows down and heard no music, but almost immediately received notice from the police dispatcher that Anne-Marie had just emailed to complain that "she had just heard Mr. O'Neal pulling into the driveway with his noise blasting." Apart from the initial noise citation, despite having received countless calls and several hundred emails from Anne-Marie complaining about Mr. O'Neal since the No Contact order was entered, police never cited Mr. O'Neal.
On 8 May 2013, in Wake County District Court, Judge Dan Nagle found Defendants each guilty of misdemeanor stalking. Both Defendants appealed to superior court and were ultimately indicted on 6 January 2015 for felony stalking.[3] Defendants were tried jointly on 18 April 2016, and the jury found them both not guilty of misdemeanor stalking and guilty of felony stalking.
Defendants timely appealed.
Analysis
Defendants, while tried jointly, have presented separate arguments on appeal. To ensure fairness and transparency, while remaining concise in our holding, we will address each of Defendants' overlapping arguments together, but will highlight the disparities in their respective arguments and resolve any issues unique to either of the two Defendants. Defendants generally contend that the trial court erred by denying their motions to dismiss because there was insufficient evidence to support the felony stalking charges. Defendants also assert that, as applied to them, N.C. Gen. Stat. § 14-277.3A -the felony stalking statute-impermissibly restricts their rights to free speech under the First Amendment. For reasons we will explain, we disagree.
I. Standard of Review
Our Court applies a de novo standard of review to appeals from the denial of a motion to dismiss. State v. Smith , 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "When ruling on a defendant's motion to dismiss, the trial court must determine whether there is substantial evidence (1) of each essential element of the offense charged, and (2) that the defendant is the perpetrator of the offense." Id. at 62, 650 S.E.2d at 33 (citing State v. Earnhardt , 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982) ; N.C. Gen. Stat. § 15A-1227 (2005) ). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Cummings , 46 N.C. App. 680, 683, 265 S.E.2d 923, 925 (1980). "It is well established that when considering a motion to dismiss, the evidence must be viewed in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom." State v. Denny , 361 N.C. 662, 665, 652 S.E.2d 212, 213 (2007) (internal quotation marks and citation omitted). "In addition, the defendant's evidence should be disregarded unless it is favorable to the State or does not conflict with the State's evidence." State v. Fritsch , 351 N.C. 373, 379, 526 S.E.2d 451, 455 (2000) (citation omitted).
This Court also applies de novo review to constitutional challenges, and if we determine that error occurred, the State must prove that the error was harmless beyond a reasonable doubt. N.C. Gen. Stat. § 15A-1443(b) (2015) ; see also State v. Tate , 187 N.C. App. 593, 600, 653 S.E.2d 892, 897 (2007) ("The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." (citation omitted) ).
II. Sufficiency of the Evidence
The General Assembly has defined felony stalking, for which the offender is subject to a Class H felony, as "the offense of stalking when there is a court order in effect prohibiting the conduct described under this section by the defendant against the victim ...." N.C. Gen. Stat. § 14-277.3A(d) (2015). Section 14-277.3A of the North Carolina General Statutes provides in part:
A defendant is guilty of stalking if the defendant willfully on more than one occasion harasses another person without legal purpose or willfully engages in a course of conduct directed as a specific person without legal purpose and the defendant knows or should know that the harassment or the course of conduct would cause a reasonable person to do any of the following:
(1) Fear for the person's safety or the safety of the person's immediate family or close personal associates.
(2) Suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment.
N.C. Gen. Stat. § 14-277.3A(c). Section 14-277.3A further defines "course of conduct" and "harassment" as follows:
(1) Course of conduct.-Two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, is in the presence of, or follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
(2) Harasses or harassment.-Knowing conduct, including written or printed communication or transmission, telephone, cellular, or other wireless telephonic communication, facsimile transmission, pager messages or transmissions, answering machine or voice mail messages or transmissions, and electronic mail messages or other computerized or electronic transmissions directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose.
N.C. Gen. Stat. § 14-277.3A(b)(1) - (b)(2). Therefore, to survive a motion to dismiss for felony stalking on the basis of a prior order prohibiting a defendant's conduct, the State must present sufficient evidence that: (1) there was an order prohibiting the defendant from engaging in conduct described under N.C. Gen. Stat. § 14-277.3A ; (2) the defendant acted willfully in violation of the order; (3) engaged in a course of conduct or harassment as prohibited by the statute; (4) did so without legal purpose; and (5) placed the victim in a reasonable fear or suffering as set forth in subsection (c).See N.C. Gen. Stat. § 14-277.3A.
A. Without Legal Purpose
Defendants first attempt to attack the "without legal purpose" prong of the required showings. Anne-Marie argues that N.C. Gen. Stat. § 14-277.3A criminalizes only those described actions of "harassment" or "course of conduct" when engaged in without a legal purpose. This argument, however, misconstrues the State's burden under the statute. Her argument is premised on the notion that if there is any evidence that the conduct upon which the State relies may be done for some legal purpose or is not "illegal" in and of itself, then the State has failed to demonstrate that the conduct was done "without a legal purpose." The statute provides that the State must demonstrate that the conduct engaged in by Defendants was done "without a legal purpose," or in the context of "harassment," the conduct "serves no legitimate purpose." This burden may be met regardless of evidence that the actions Defendants engaged in could have been done with legal purpose. See, e.g., Fritsch , 351 N.C. at 379, 526 S.E.2d at 455 ("[T]he defendant's evidence should be disregarded unless it is favorable to the State or does not conflict with the State's evidence." (citation omitted) ). When both parties present evidence of a defendant's purpose, "the matter [is] appropriately left for resolution by the jury." State v. Wooten , 206 N.C. App. 494, 501, 696 S.E.2d 570, 576 (2010).
Here, the State presented substantial evidence that Defendants acted with the intent and illegitimate purpose of harassing, monitoring, and terrorizing the O'Neals. A neighbor's testimony that Anne-Marie admitted to using the decorations to make sure she and her husband "had their eyes on Mr. O'Neal" supports a finding by the jury that the house decorations were displayed by Defendants with the intent of conveying a message to the O'Neals that Defendants were continuously monitoring them. While Defendants assert now that these decorations were a form of free expression protected under the First Amendment and did not violate any statute or local ordinance, this argument misconstrues their burden on appeal. As explained above, where there is evidence of two possible purposes, it is properly left to the jury to decide the issue-which is what the trial court correctly allowed in the present case.
With regard to the home security cameras, the State met its burden of presenting sufficient evidence that the cameras were intended, not for a legal or legitimate purpose, but rather to intimidate and harass the O'Neals. The video footage revealed that the cameras were angled such that there was minimal view of Defendants' property and maximum view of the O'Neals'. This evidence, in combination with the actions that led up to the installation of the cameras-ethnic intimidation charges and no contact order-is sufficient to allow a reasonable juror to find that the cameras were placed to intrude into the O'Neals' home and to convey a message of harassment and monitoring prohibited by the felony stalking statute, N.C. Gen. Stat. § 14-277.3A.
Anne-Marie compares Defendants' conduct to that at issue in Kennedy v. Morgan , 221 N.C. App. 219, 224, 726 S.E.2d 193, 196 (2012), in which this Court held that an ex-husband's act of hiring a private investigator to surveil his ex-wife's house was insufficient to support a finding of harassment with no legitimate purpose. The investigator parked on a public street for a few nights, took measures to avoid detection, and never approached or interacted with the ex-wife or anyone else at the house. Id. at 220, 726 S.E.2d at 194. Here, by contrast, Defendants blatantly surveilled the O'Neals and repeatedly uttered names and sounds directed to them. This evidence was sufficient to allow a reasonable juror to find that Defendants installed the cameras with the intent to convey, and did in fact convey to the O'Neals, that they were under constant surveillance. We therefore reject Defendants' argument that our reasoning in Kennedy requires reversal of their convictions.
Defendants' numerous unsubstantiated police complaints against Mr. O'Neal, when considered in context with all other evidence, also were sufficient to submit the issue of whether such actions were taken "without legal purpose" to the jury. The State presented more than 200 emails that Defendants sent to police over the course of the dispute. The emails complained of various issues including loitering and noise. Police responding to one such complaint, a report of a suspicious person, discovered that the person was Mr. O'Neal riding his bicycle on the street near his home. The State presented ample evidence to meet its burden of demonstrating that Defendants communicated with police without the legal purpose of reporting a crime.
Defendants also argue that none of the conduct alleged by the State-the decorations, security cameras, and police reports-was prohibited by the No Contact Order, and therefore could not support a charge for felony stalking. We reject this argument. The No Contact Order directed Defendants to have "NO CONTACT WITH ALLEGED VICITM IN ANY MANNER." The order by its plain language encompasses both direct and indirect contact. As discussed above, the State presented evidence that decorations were intended to convey a message of constant surveillance, the video cameras did in fact convey such a message, and the police reports resulted in continued interactions with police for Mr. O'Neal. Accordingly, the trial court did not err in denying Defendants' motions to dismiss on this basis.
B. Reasonable Fear of Continued Harassment
Anne-Marie argues that N.C. Gen. Stat. § 14-277.3A requires the State to present evidence that she knew or should have known "that the harassment or the course of conduct would cause a reasonable person to [fear] ... for the person's safety or the safety of the person's immediate family or close personal associates ... [or] [s]uffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment ," N.C. Gen. Stat. § 14-277.3A(c), and that the State failed to meet its burden. This argument is without merit.
The State's evidence demonstrated that with each thwarted attempt at harassing Mr. O'Neal, Defendants engaged in new and creative ways to continue their campaign. Following the initial charges and No Contact Order, Defendants installed intrusive and intimidating security cameras aimed directly at the O'Neals' property. After police seized the cameras, Defendants placed eyeball decorations around their property facing the O'Neals' property, with the intent to convey the message that they were constantly monitoring the O'Neals. Police officers testified that they instructed Anne-Marie to cease emailing complaints about Mr. O'Neal, yet she continued to send emails to police reporting his daily comings and goings. We hold that this pattern of conduct is sufficient allow the jury to find that Defendants knew or should have known that their conduct would place a reasonable person in fear of continued harassment as defined by N.C. Gen. Stat. § 14-277.3A. Accordingly, we hold the trial court did not err in denying Defendants' motions to dismiss on this basis.
Because the State presented sufficient evidence that Defendants' conduct was engaged in willfully and without legal purpose, regardless of the evidence Defendants presented regarding their intent, the issue was properly left to the jury to decide. Accordingly, the trial court did not err in denying Defendants' motions to dismiss for insufficient evidence.
III. Constitutionality of N.C. Gen. Stat. § 14-277.3A
Defendants assert that N.C. Gen. Stat. § 14-277.3A, as applied to them in the present case, is an unconstitutional violation of their First Amendment rights to free speech and expression. We disagree.
The first question we must determine is whether the First Amendment is even implicated by N.C. Gen. Stat. § 14.277.3A. See State v. Bishop , 368 N.C. 869, 872, 787 S.E.2d 814, 817 (2016). To do so we consider whether the statute restricts protected speech or expressive conduct, or affects only nonexpressive conduct. Id. at 872, 787 S.E.2d at 817. The United States Supreme Court has long held that "otherwise proscribable criminal conduct does not become protected by the First Amendment simply because the conduct happens to involve the written or spoken word." Id. at 872-73, 787 S.E.2d at 817 (citing United States v. Alvarez , 567 U.S. 709, 721, 183 L.Ed. 2d 574 (2012) (plurality opinion) (noting that "speech integral to criminal conduct" remains a category of historically unprotected speech); accord Giboney v. Empire Storage & Ice Co. , 336 U.S. 490, 502, 93 L.Ed. 834 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (citations omitted) ) ). Our Court has similarly held that a statute prohibiting certain conduct, while involving "speech," does not necessarily violate the First Amendment when the statute's focus is on the conduct. State v. Camp , 59 N.C. App. 38, 42-43, 295 S.E.2d 766, 768-69 (1982) (holding that a statute barring use of a telephone to harass another person implicated conduct, not speech, and therefore did not violate the First Amendment), appeal dismissed and disc. rev. denied , 307 N.C. 271, 299 S.E.2d 216.
The North Carolina Supreme Court held in Bishop that N.C. Gen. Stat. § 14-458.1(a)(d), known as the cyberbullying statute, created a content based restriction on protected speech because it criminalized speech by its subject matter. Bishop , 368 N.C. at 876, 787 S.E.2d at 819. The statute prohibited Internet posting of "private, personal, or sexual information pertaining to a minor." By contrast, N.C. Gen. Stat. § 14-277.3A, the stalking statute, does not restrict any speech based on its content. Rather, it criminalizes conduct directed toward another person when done for an illegitimate purpose. N.C. Gen. Stat. § 14-277.3A. As explained above, the evidence the State presented permitted the jury to find that the conduct for which Defendants now assert is "expressive" and protected by the First Amendment was not engaged in for an expressive reason, but instead for the illegitimate reason of harassing Mr. O'Neal.
Defendants premise their argument on the theory that the jury found them guilty of felony stalking based on the "googly eye" decorations placed around their property; they contend those decorations were free expression protected by the First Amendment. Defendants also contend that, while unpleasant and unkind, their use of language such as "frog" and "pig" to refer to the O'Neals is likewise protected. This argument fails to recognize that N.C. Gen. Stat. § 14-277.3A prohibited their course of conduct-regardless of the subject matter of any expressive component-because it was directed at a specific person and served no legitimate purpose. Defendants point to no evidence presented at trial that they were seeking to express a message unreleated to Mr. O'Neal and only incidentally harassing him. Because N.C. Gen. Stat. § 14-277.3A does not prohibit any particular speech, but rather prohibits harassing conduct directed toward a victim, and because there was evidence that Defendants were not engaging in any expression independent of their animus directed at Mr. O'Neal, or engaging in any conduct for a legitimate legal purpose, we reject Defendants' argument.
IV. Error in State's Closing Argument
Anne-Marie argues that the trial court erred by failing to intervene ex mero motu during the prosecutor's closing argument after the prosecutor stated that "racial slurs" are not protected by the First Amendment and equated the security cameras' "shooting" a picture of the O'Neals' property with shooting a gun onto it. We disagree.
We review whether a trial court errs by failing to intervene in closing arguments ex mero motu , by assessing whether the "alleged improper closing arguments ... were so grossly improper that the trial court committed reversible error ...." State v. Jones , 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citations omitted). "In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord ...." Id. at 133, 558 S.E.2d at 107.
Anne-Marie takes issue with the following portion of the prosecutor's closing argument:
You were told, and I'm going to tell you it's not the case, that the First Amendment protects speech, hate speech. That is not true. That is a false statement of the law. You may not yell racial slurs at people because that behavior-can you print it somewhere in your own home? Sure, you can. That is protected. But when you start going out and you're yelling it at somebody, that is likely to incite violence. Quite frankly, I'm surprised it didn't. That's what the First Amendment says.
They want to tell you-they're always in their yard. They never left their yard. So they're on their property. Can't they do whatever they want? Let's take that a step further. Let's say I'm on my property, I shoot a gun across the street. Does that mean that I'm not in trouble for whoever I hit? Of course not. They're on their property, they shoot. Their camera views right across that street, they're responsible. It's the same thing.
Anne-Marie argues that this argument strayed so grossly from the "parameters of propriety" that the trial court should have intervened.
We hold that these remarks do not rise to the level of gross impropriety necessary for a reviewing court to conclude that a trial court abused its discretion in not intervening ex mero motu . "Grossly improper argument is defined as conduct so extreme that it renders a trial fundamentally unfair and denies the defendant due process." State v. Fair , 354 N.C. 131, 153, 557 S.E.2d 500, 517 (2001) (citations omitted). Here, nothing in the prosecutor's remarks, when taken in context, rendered the trial fundamentally unfair trial in violation of Defendants' right to due process. Moreover, because Anne-Marie was acquitted of the misdemeanor charge, the only charge to which the racial language is evidence, she could not have been prejudiced by the prosecutor's reference. See State v. Barns , 344 N.C. 79, 95, 472 S.E.2d 867, 878 (1996) (overruling the defendant's similar argument on the basis that the jury "rejected the theory" to which the prosecutor's statements applied).
Accordingly, we reject Defendants' argument and hold that the trial court did not err by failing to intervene ex mero motu during closing arguments.
V. Jury Instructions
Anne-Marie's final argument asserts that the trial court plainly erred by instructing the jury on a material fact that was not alleged in the indictment-specifically that the No Contact Order prohibited Defendants from "stalking" the O'Neals.[4] We disagree.
Defendants failed to object to the instructions given at trial, and we therefore review any asserted errors regarding the jury instructions for plain error. See State v. Lawrence , 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). Under plain error review, "a defendant must establish that the trial court committed error and that absent this error, the jury would have probably reached a different result." State v. Gainey , 355 N.C. 73, 93, 558 S.E.2d 463, 477 (2002) (citation omitted).
Anne-Marie asserts that the trial court's instruction that "[t]here was a court order in effect which had been issued on March 28, 2012, pursuant to North Carolina law prohibiting the Defendant from stalking Wilbert O'Neal[,]" created a fatal variance from the indictment because the emphasized part of the instruction is not interchangeable with "no contact in any manner[,]" as is listed in the No Contact Order. Anne-Marie also argues that this alleged misstatement in the jury instruction amounted to a peremptory instruction that intruded into the province of the jury by deciding the issue of whether Defendants' conduct was prohibited by the No Contact Order.
The North Carolina Supreme Court has held that "[w]hen analyzing jury instructions, we must read the trial court's charge as a whole." State v. Fowler , 353 N.C. 599, 624, 548 S.E.2d 684, 701 (2001), overruled in part on other grounds by State v. Tanner , 364 N.C. 229, 695 S.E.2d 97 (2010). " 'If the charge presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for reversal.' " State v. Rich , 351 N.C. 386, 394, 527 S.E.2d 299, 303 (2000) (quoting State v. Lee , 277 N.C. 205, 214, 176 S.E.2d 765, 770 (1970) ).
A review of the jury instructions reveals that, as a whole, the instructions fairly and accurately presented the law for felony stalking, and did not create a fatal variance or function as a peremptory instruction. The trial court's statement that a court order prohibited Defendants from stalking Mr. O'Neal was qualified by the contextual paragraph in which the trial court stated: "For you to find the Defendant guilty of [felony stalking], the State must prove three things beyond a reasonable doubt .... And third, that there was a court order in effect which had been issued on March the 28th, 2012, pursuant to North Carolina law prohibiting the Defendant from stalking Wilbert O'Neal. " Read as a whole, the trial court's instructions explained to jurors that in order to find Anne-Marie guilty, they must find that there was such an order in place, not that the No Contact Order itself prohibited the stalking. We hold that the trial court did not err, let alone plainly err, in its jury instructions.
Conclusion
For the foregoing reasons, we hold that Defendants' trial was free from error and that N.C. Gen. Stat. § 14-277.3A is not unconstitutional as applied to Defendants.
NO ERROR.
Report per Rule 30(e).
Judges ELMORE and BERGER concur.

Court documents list Ms. Mazur's first name as Anne Marie, however, Appellant's brief, along with personal emails sent from Anne-Marie that were included in the evidence, indicate a hyphenated spelling. For consistency within our opinion, we will refer to Ms. Mazur as "Anne-Marie."

While three cameras were installed, only two were properly connected to the network, which provided a thirty-day back up of video footage.

Defendants initially were indicted on felony charges of intimidating a witness, but those charges were replaced by felony stalking charges in a superseding indictment.

Michael does not present a challenge to the jury instructions and therefore waives this argument.